# CHARLESTON.

## STATE v. P. H. BAILEY

## (No. 5827)

Submitted May 3, 1927.     Decided May 10, 1927.

1. CONTINUANCE—CRIMINAL LAW—*Refusal of Continuance for Absent Witnesses is Not Cause for Reversal Except on Clear Abuse of Discretion to Prejudice of Complainant.*

   An appellate court will not reverse because of refusal to grant a continuance, because of absent witnesses, unless it is clear that the trial court has abused its discretion to the prejudice of the party who desired it.   (p. 612).

   (Criminal Law, 17 C. J. § 3578.)

2. APPEAL AND ERROR—CRIMINAL LAW—*Alleged Error in Cross-Examining Witness Beyond Legitimate Scope, in Absence of Objection or Exception Saved at Trial or Otherwise Appearing in Record Will Not be Considered on Appeal.*

   Alleged error, because of cross-examination of a witness beyond the legitimate scope, to which there is no objection or exception saved in the trial or otherwise appearing in the record, will not be considered in the appellate court.   (p. 613).

   (Criminal Law, 17 C. J. §§ 3331, 3342.)

3. INSTRUCTIONS—CRIMINAL LAW—*Instructions Must be Considered Together, Where There is Evidence to Which Correct Abstract Instruction is Applicable, it Will be Presumed Jury Properly Applied it; Instruction That Homicide is Presumed Second Degree Murder, State Having Burden to Show it First Degree and Prisoner Having Burden to Show Offense Below Second Degree Murder, Held Not Error in View of Other Instructions.*

   The instructions must be considered together; and where a correct abstract instruction has been given with others, and there is evidence to which it is applicable, it will be presumed that the jury properly applied it.   (p. 613).

   (Criminal Law, 16 C. J. § 2486 [Anno]; Homicide, 30 C. J. § 616.)

4. INSTRUCTIONS—CRIMINAL LAW—HOMICIDE—*Giving Instruction Correct in Form and Substance Based on Evidence of Fact is Not Error, Although Other Evidence Strongly Negatives Fact.*

   Where there is evidence of a fact on which an instruction, correct in form and substance, is asked, it is not error to give

the instruction, although there is other evidence introduced which strongly negatives the fact. (p. 614).

(Criminal Law, 16 C. J. § 2486 [Anno]; Homicide, 30 C. J. § 616.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, McDowell County.

P. H. Bailey was convicted of second degree murder, and he brings error.

*Affirmed.*

*Joseph M. Crockett, D. L. Auvil,* and *Charles A. Tutwiler,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *J. Luther Wolfe,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

Upon a verdict of second degree murder defendant was sentenced to confinement for nine years, and he prosecutes error.

The theory of the defense was that defendant's reason was dethroned and he was mentally incapable of governing himself at the time he fired the fatal shot, because of adulterous relations existing between his wife and the deceased which had come to his knowledge from others and by admissions from the wife and the deceased, a short time before the homicide. Self-defense does not enter into the case. His reason for killing the deceased is expressed by him in these words: Q. "Why did you fire on him?" Ans. "The way he had abused me, and I was afraid of him, and the way he had acted and mistreated me and my family, and tantalized me, and he just kept on until I could not control myself."

Two prior trials had been had on the indictment. The first resulted in a verdict of first degree murder, which was set aside on a writ of error; the second trial resulted in a mistrial, and this, the third trial, as above stated.

Defendant and the deceased Roberts had been friends from early youth, both were married, and resided at the time of the

alleged murder in McDowell County, which murder occurred
on the night of July 9, 1924. Prior to that time in 1924, de-
fendant, his wife and five small children had lived in Nicholas
County where he' and Roberts worked together as miners.
Defendant's sister Laura and a Miss Freda Jarvis lived with
him in Nicholas County. Roberts while so working in the
coal mine crushed his foot, and when he came from the hos-
pital, a day or so after the injury, on crutches, went to live
with defendant's family. Defendant returned to McDowell
County in June, 1924 to testify in a civil trial, and while
there was informed by Robert's wife, who had remained in
that county while Roberts was in Nicholas County, that her
grandfather, Johnny Roberts, had told her he had seen some
bad things going on between defendant's wife and her hus-
band (the deceased). The defendant thereupon caused his
wife and family to return to McDowell County. They ap-
pear to have been accompanied by Laura Bailey, defendant's
sister, and Miss Jarvis. It does not appear when Roberts re-
turned to McDowell. The first time defendant saw him there
was on July 8, 1924, when defendant and wife who had been
living with defendant's father since July 3rd, went to Collins
Ridge, in the vicinity. Roberts, his wife and another woman
were working in a cornfield, and defendant stopped to in-
quire about some personal effects he had left in Nicholas
County. Defendant and wife took supper with Reverend
Davidson who appears to have been conducting revival meet-
ings in a nearby schoolhouse. Deceased and his wife, and
defendant and wife attended the night meeting. While the
four were near the preacher's house, defendant told deceased
about the report he had heard concerning the relations be-
tween him and defendant's wife, which report deceased
branded as false, but his (deceased's) wife said it was true.
Deceased reprimanded his wife and produced a pistol from
his saddlebags (he was on horseback, being crippled), and
the party broke up. Defendant and wife lodged with the
preacher that night, and in the morning the preacher took
defendant's wife to a neighboring notary public to have her
make a denial statement, presumably in writing, concerning

the report of her misdoings, after which defendant and wife started home. Nearby they met the deceased, who, in the presence of the preacher, admitted that he had been intimate with defendant's wife for a period of about three months. They then left the preacher and traveled together for about 300 yards, the wife being some distance ahead. While traveling, according to defendant's testimony, deceased intimated that he had forced defendant's wife to have relations with him, and had whipped some of the small children when in Nicholas County. They then separated, and before defendant overtook his wife, he met John Walker who told him that Roberts had told him (Walker) that he (Roberts) had been courting defendant's wife. Upon overtaking his wife, she confessed to him that Roberts had forced her by threatening her with a gun, and that she could prove her statement by Laura Bailey and Freda Jarvis. They then went to see Freda, who confirmed what the wife had told.

Defendant and his wife and Freda then started to go to a town named Iaeger, by way of a place named Panther, for the purpose of having a warrant issued for deceased. On the way they met Tilda Bailey who told defendant that there had been bad reports about his wife and Roberts. About four or five o'clock they arrived at Panther, where Sherman Keen told defendant that he had seen bad conduct between deceased and the wife while at a dinner at defendant's house. At Panther defendant met Ira Cline, chief of police of Iaeger, with whom he drove to Iaeger, leaving his wife and Freda to come by train. At Iaeger, Justice A. J. Cline issued a warrant for Roberts on a charge of carrying a revolver, gave it to defendant and instructed him to deliver it to W. R. Allen, constable, to whom it was directed. The warrant was delivered to Allen who deputized defendant to accompany him, furnishing to defendant an empty revolver. They went to Collins Ridge and found that deceased was at the schoolhouse attending the religious services being held there. About one-half a mile from the schoolhouse they stopped at a country store where defendant purchased thirty-two cartridges, some cigarettes, and borrowed a carbide lamp. McIntire, the

storekeeper, says that defendant told him that he was going to arrest Roberts for a rape committed in Nicholas County on Freda Jarvis, and that they had sent him to make the arrest. Defendant denied making this statement.

Upon reaching the schoolhouse, the constable and defendant remained in front until the services ended, when deceased appeared at the door in his shirtsleeves, the minister, a Mr. Robinette, and others following him. There was a porch with railings to the front of the building, with a flight of seven steps to the ground. When Roberts, who was on crutches, stepped upon the second step in his descent, Allen accosted him, saying he had a warrant for his arrest, and asked him if he had a gun, to which he replied (according to defendant), "I guess I have, you better search me and see." Allen then directed defendant to go up to deceased; he did so, and upon reaching deceased, defendant put his left hand on the hip-pocket of deceased, who knocked it off with his hand; there-upon defendant, who had his pistol in his right hand, fired it. The bullet entered the back of the head and came out over the left eye, causing instant death. When asked why he fired the shot, defendant gave the answer quoted above. The version of the incidents leading up to and including the tragedy, thus detailed, are taken from defendant's testimony; and perhaps it is not necessary to detail the evidence for the state.

Chief of Police Cline, a witness for defendant, says that on the way from Panther to Iaeger, defendant told him that he wanted to get a pistol warrant for Roberts and take him back to Nicholas County where he had raped Freda Jarvis; and on the way asked what ought to be done with a man who did that; and upon being asked what he thought should be done with such a man, he replied that "he ought to have his brains blowed out, and if he made a move when he went after him he would blow them out." A number of witnesses who saw the homicide say that Allen asked Roberts if he had a gun on him, and Roberts replied that, "I guess I have, search me and see;" that thereupon defendant walked up behind Roberts quickly touched or searched each hip-pocket, then shot from behind, and jumped off the porch; that no word was spoken

between them, and that Roberts never took his hands off the cross-pieces in his crutches. Reverend Davidson, a defense witness, in detailing the circumstances between defendant and deceased which occurred in the morning when he was present, says that defendant told Roberts his (defendant's) wife had been "crooked" ever since he had married her. Neither the wife of defendant nor Robert's wife were witnesses. There was evidence that on the day of the homicide, after his wife had retracted her denial and made the admission, defendant was much perturbed and distressed and that tears came into his eyes.

Do the facts detailed above from defendant's testimony justify defendant in taking the life of Roberts? The law in this State does not do so. Frequently juries will not convict the husband or father who has killed the ravisher or seducer. They invoke the "unwritten law", and pay no attention to the instructions given by the court. And it is within the province of the jury to say that the homicide was due to passion aroused by a provocation which blinded reason. The court, in this case told the jury that if they believed from the evidence that defendant and deceased had been friends until the spring of 1924; that defendant reposed confidence in the deceased; that deceased abused that confidence and had adulterous relations with the wife; that the night before the killing deceased denied the relation and threatened defendant, and on the following day admitted his adulterous conduct in the presence of the preacher; the confession by the wife, strengthened by information from others; that defendant then obtained the warrant and was deputized by Allen to assist in making the arrest; that when the accused met the deceased his reason was dethroned and his mind impaired by reason of the incidents related, and that he was incapable of governing himself, and while in such mental condition fired the fatal shot; then they should find him not guilty. All of the instructions, nine in number, offered by defendant were given. His theory of defense was fully placed before the jury by his evidence and instructions.

The errors alleged are: (1) Refusal of continuance, because of absence of material witnesses; (2) Misconduct of the prosecutor in cross-examination of defendant; and (3) Erroneous instructions given on behalf of the State.

The motion for continuance was based on the absence of W. R. Allen, Freda Jarvis, John Jarvis, W. A. Justice and Will Justice. Allen was the constable who had the warrant and was present at the shooting, and it is contended that his evidence was material inasmuch as there was a conflict of evidence as to what occurred at the time of the shooting. There was evidence that Allen directed defendant to search Roberts; other witnesses did not hear the direction given. Allen's evidence would have been cumulative. Moreover, it appears that Allen had attended the former trials and had not been placed on the stand by the defense. He had moved to Virginia a short distance over the State line, and defendant had undertaken to serve process on him, but did not find him at home. He had been over the State line for nearly a year before the trial, a fact known to defendant. It is contended that Freda Jarvis was a material witness because she could have told of the alleged assault by the deceased on defendant's wife in Nicholas County. That fact could have been shown by defendant's wife. She did not take the witness stand. Whether there was such an assault in fact was immaterial, if defendant believed that it had been made at the time he did the shooting, and he says he believed what was reported to him by others and by the admissions of both his wife and the deceased. The materiality of the evidence of John Jarvis is not shown. It was throught he would state that deceased was not on crutches when in Nicholas County. He had been at a former trial and was not used as a witness. W. A. Justice was a character witness, and it was expected that he would say that Johnny Roberts, father of the deceased, had told him that his son had deserted his own family and was following defendant's family to Nicholas County. It was expected to be shown by Will Justice that Johnny Roberts had said that if they could keep hid the pistol (supposed to have been on deceased's person at the time of the killing), they could "rail-

road" defendant to the penitentiary. Whether deceased was armed is of little weight, for there is no suggestion that defendant acted in self-defense. In view of the former trials and continuances, the cumulative and immaterial character of the alleged evidence which these absent witnesses would have given, and the fact that some of them were present and were not used on former trials, we cannot say that the trial court abused its discretion in refusing a continuance. *State v. Whitecotten,* 101 W. Va. 492.

Error is predicated on alleged misconduct of the prosecuting attorney in cross-examination of defendant, in asking defendant if he had not told a person named that he had watched his home in Nicholas County to ascertain if his wife and deceased were intimate, and in asking him if he had not made statements denying the legitimacy of his children. Defendant denied these statements, and the State did not offer evidence to contradict. It is argued that such examination tended to humiliate and degrade defendant, and was prejudicial. There was no objection to the questions. No special bills of exception were taken, and this alleged error was not made a ground in the motion to set aside the verdict. This alleged error cannot be considered.

The remaining point of error is upon the instructions for the State. State's instruction No. 1 told the jury that every homicide is presumed to be murder in the second degree, and in order to elevate the offense to murder of the first degree the burden of proof was on the State, and in order to reduce the offense below murder of the second degree, the burden of proof was on the prisoner. It is argued that the instruction should have told the jury that they should consider all the evidence in determining the degree of guilt, and if the State's evidence reduced the offense to a lesser crime or no crime at all, they should so find. The homicide was admitted and justification relied upon, and the jury were told in other instructions that they should consider all the evidence and circumstances in arriving at their verdict. This instruction is abstract, but is not peremptory. Instructions must be considered as a whole. The jury could not have been misled, and we perceive no

reversible error in giving the instruction. *State* v. *Sauls,* 97 W. Va. 184. It is presumed the jury made the proper application of the abstract instruction. *State* v. *Stafford,* 89 W. Va. 301.

State's instruction No. 2, claimed to be erroneous, told the jury that if they believed from the evidence that the deceased and defendant's wife had been guilty of adulterous acts, that the prisoner had been informed of such acts, and that the prisoner believed them to be true, yet if the acts were in fact true, and believed by the prisoner to be true, the law would not justify or excuse the prisoner in seeking the deceased and killing him, if they believed from the evidence that he did so. It is argued that this instruction is bad because it assumes that defendant sought deceased in order to kill him. We do not so interpret it. The evidence shows that defendant applied to Justice Cline, obtained a pistol warrant, and accompanied the constable, at the latter's request, to execute it. There was evidence from his own witness that while on the way to obtain the warrant, he said if deceased made a move when he went after him he would blow his brains out. There was evidence on which to base the instruction.

State's instruction No. 4 told the jury, in substance, that if they believed from all the evidence the adulterous acts on the part of deceased were true, that the prisoner was informed thereof and believed them to be true, yet if they further believed beyond reasonable doubt that the prisoner then made up his mind to kill the deceased out of a spirit of revenge, and went to the church as detailed to carry out his intent, and there, being sane and normal at the time, did without provocation, wilfully, deliberately and with premeditation kill the deceased, then they should find him guilty of murder in the first degree. The criticism of this instruction is that it does not propound the law correctly. A discussion of the legal principle challenged will be found in *State* v. *Cline,* 100 W. Va. 57, and it is not necessary to repeat it here. While the jury might have found a verdict of first degree murder under this instruction and the evidence, they did not do so. Out of consideration of the grave cause which produced the tragedy,

they have found that the act was done without premeditation or deliberation, but with malice. It was within their province to so find, and we are not disposed to criticize the finding.

Perceiving no reversible error, the judgment will be affirmed.

*Affirmed.*