STATE OF WEST VIRGINIA

*v.*

AUBREY BOGGS

(No. 9845)

Submitted October 1, 1946. Decided December 3, 1946.

*Wysong & Wysong* and *G. C. Belknap,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, *Ralph M. Hiner,* Assistant Attorney General and *Eston B. Stephenson,* Special Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

Upon conviction of murder of the second degree the Circuit Court of Webster County sentenced Aubrey Boggs, defendant, to confinement in the penitentiary for five to eighteen years. To the judgment of sentence defendant prosecutes this writ of error.

Shortly after midnight of September 30 and October 1, 1945, the decedent, Thurmond Farley, eighteen years of age, was shot and killed by his brother-in-law, Aubrey Boggs, in the home of defendant's father, Edgar Boggs, located on State Route 20 about two miles south of Cowen in Webster County.

The Boggs home is square in shape and divided into seven rooms. Its only entrance is from the front, the door opening into a center room designated in the record as the "sitting room". There is a bedroom to the left of the sitting room, spoken of as the "large bedroom", and another to the right, each being connected with the sitting room by a doorway. Directly to the rear of the sitting room and connected by a doorway, there is a dining room, measuring ten feet and seven inches by twelve feet. To the left of the dining room a doorway leads into a small bedroom, usually occupied by defendant; and on the opposite side of the dining room an entrance leads into the kitchen. There is a third bedroom on the left of the house between the large bedroom and defendant's bedroom, the only entrance to which opens into the large bedroom. The entrance to this middle bedroom and the front entrance leading into the sitting room have hung doors, and all other entrances between the rooms are without hung doors. At the time of the homicide, curtains were hung over the entrance between the sitting room and the large bedroom and over the one between the dining room and defendant's bedroom.

The foregoing room arrangement was gleaned from rather sketchy descriptions testified to by Sheriff H. F. Bickel and Corporal G. F. Parsons, State Department of Public Safety, both State witnesses. The jury, however,

was not so limited, having had the advantage of a "view" of the premises.

The State's case in chief, with exception of what the autopsy revealed, is based primarily on what the defendant told the officers on their arrival. Constable McCartney, the first officer to appear on the scene, testified that defendant "just said he had killed him [Farley]," and that immediately before or after that statement, witness could not remember which, defendant handed him two guns. Sheriff Bickel and Corporal Parsons arrived about three o'clock in the morning. The sheriff, in answer to the question, "Will you tell the jury what he [defendant] told you?", stated: "He said he did it in self-defense" and that decedent "came into the kitchen to light a cigarette, and that Nora Lee Miller got his [defendant's] cigarette—he was in the bedroom in bed—and went out to light Farley's cigarette off of his, and that they got in some kind of scuffle there and he saw the gun and Mr. Farley started toward him with the gun and he shot him." On cross-examination Corporal Parsons in answer to the question, "Now, all that you learned there was, when you talked to the defendant, you were advised by him that he did it in self defense?", stated, "Yes, sir." On direct examination, when questioned regarding the place where defendant stated he stood when he fired the fatal shot, the corporal answered, "He told me that he shot Farley as he came out of the kitchen," and he further testified that defendant did not show witness where he stood.

The officers testified that when they arrived at the scene of the shooting, they found decedent's body lying on its back, with the head opposite the doorway to defendant's bedroom and the feet pointing toward the doorway between the sitting room and dining room. A neighbor, Ira Goff, another witness for the State, who arrived at the Boggs home shortly after the homicide stated he found decedent's body lying on the floor "by the side of the dining room table."

Dr. J. M. Cofer, also a State witness, and the physician who performed the autopsy on decedent's body, testified that the bullet entered "in the right side of the breast about an inch and a half from the breastbone and between the fifth and sixth ribs"; and was found "to the left of the spinal column", in the inner space between "the twelfth dorsal and first lumbar vertebra." He testified that the bullet was lodged about fifteen inches from the place where it entered decedent's body and took "a downward-backward course."

Farley was a large man, about six feet tall, weighing about one hundred seventy-five pounds. There is evidence that when under the influence of intoxicating liquor, he was quarrelsome and dangerous. He had been discharged from the Army during the early part of September, 1945. In December, 1942, just prior to his entry into the armed services, he had married Ester Boggs, defendant's sister, and after his discharge from the Army, it is apparent that he and his wife had been having marital difficulties. On his last furlough prior to his discharge from the Army, and shortly after midnight on July 28, 1945, Farley, while in a drunken state, and seemingly very angry and threatening, entered the living quarters of Murray Sigman, his brother-in-law, in Cowen, and kicked the latch from the door to Mrs. Sigman's room, apparently looking for his wife. At that time defendant was rooming with the Sigmans.

On the night of the homicide defendant closed his father's restaurant about eight o'clock, carried the money belonging to the business and a pistol from the restaurant to the residence, and placed them under a pillow in his bedroom. Ester Farley and her small child were occupying the middle bedroom in the Boggs home, and defendant's father was asleep in the bedroom to the right of the living room. At approximately eight-thirty in the evening, defendant and his fiancee, Nora Lee Miller, were sitting on the davenport in the sitting room, when they saw Farley enter the sitting room through the front door and go into the large bedroom. Accord-

ing to Nora Lee Miller, Farley "looked kind of mad-like when he went through" the sitting room. Ester Farley testified that he kicked the lock from the door to the room occupied by her and her child "and come in", and an argument then ensued between them. This witness testified further that defendant was "mad and drunk—right crazy", and told witness that he was going to "get a woman [ at Bolair, a nearby community] and sleep with her and he might be back and might not". It seems that after the argument with his wife, defendant left the Boggs home and shortly thereafter appeared at the home of James Boggs and his wife, Virginia Boggs, who was Farley's sister. There he persuaded James Boggs to accompany him to Bolair. About eleven-thirty James Boggs and Farley, both in a drunken condition, returned to the James Boggs house, where Boggs went to bed and fell asleep. Before leaving the house and while pacing the floor Farely told his sister Virginia, "Jennie, I am rugged; I am not afraid of anything. I am going down and sleep with my wife or I am going to stop everything in the house * * *. Well, I would like to see anybody stop me."

About midnight Farley again appeared at the Edgar Boggs residence. Nora Miller had just gone into the large bedroom, and defendant, as he was crossing the dining room from the kitchen toward his own room, saw Farley go toward the large bedroom. From his bedroom defendant could hear Farley and his wife talking, although what was said was not intelligible to defendant. According to defendant's evidence, after he retired he called Nora Miller to come into his bedroom and light a cigarette for him; that she then proceeded from the large bedroom through the living and dining rooms into defendant's room; and that while in the last-mentioned room, Farley appeared in the doorway between the dining room and defendant's room, and, shoving his arm past Nora Lee Miller, pointed his pistol at defendant. Nora Lee Miller's testimony is to the effect that she shoved Farley back into the dining room and across to the entrance to the kitchen, and that during the course

of the scuffle, Farley's pistol fell to the floor. According to her testimony, she was pushed against the wall between the dining room and sitting room and from there she went directly into the sitting room.

Defendant said that he saw decedent reach for his pistol, which was lying near the doorway to defendant's room, and at the same time looked in defendant's direction. It was at this time, according to defendant, that he fired the fatal shot, believing his life to be in jeopardy. Decedent's wife, Ester Farley, testified that shortly before the homicide Farley had entered the middle bedroom where she and the child were lying; that "he was still mad and he was cursing", and he said "he just come back to tell me that I could sell what furniture I had and give him half the money for it the next day, that he was leaving and he wasn't coming back." Witness said that decedent told her, "I might just get tough around here tonight. I don't care to die, and I don't care to kill. I can kill a man and laugh at him as he dies. I killed a baby one time in Germany and never batted an eye." After this Farley left witness' room. Shortly thereafter Ester Farley, hearing Nora Miller scream, got out of bed and ran through the large bedroom into the sitting room, and as she reached the door leading from the sitting room into the dining room, she testified that she saw defendant, from a position just inside the entrance to his bedroom, shoot her husband, who, at the time, was about five feet from defendant, and in the act of reaching for his gun, which was lying on the dining room floor.

After the jury rendered its verdict, the defendant moved the court to set aside the verdict and assigned reasons therefor, and, upon the court overruling the motion, defendant then moved the court in arrest of judgment upon the verdict, which motion was also overruled.

The defendant offered thirty-one instructions, including defendant's instruction No. 17, which would have told the jury that it "cannot return a verdict of guilty

of either murder of the first degree or murder of the second degree"; defendant's instruction No. 18, a peremptory instruction to find for defendant; and defendant's instructions Nos. 6 and 26, which, if given, would have told the jury that a presumption of innocence arises in a defendant's favor in every criminal trial. The court refused to give any of defendant's thirty-one instructions, but gave a charge which purported to cover both the State's and defendant's theories of the case. In the charge the court instructed the jury as to the scope of the indictment and defendant's plea, and that the indictment was not to be considered as evidence; the issues to be decided; the effect of rejected evidence; the fact that the jury is the sole judge of the evidence and its weight; the effect to be given to defendant's testimony; the five verdicts possible in a trial for murder of the first degree, with definitions of the degrees of offense and the respective sentences therefor; and the court's version of the application of the doctrine of self-defense and the effect of the use of a deadly weapon. The court expressly instructed the jury that:

"The court further charges the jury that if they believe from the evidence beyond a reasonable doubt that the defendant, Aubrey Boggs, shot and killed the deceased, Thurmond Farley, with a dangerous and deadly weapon, a revolver or pistol, fired by his hand, *the law is that such killing was prima facie attended with malice entering into murder, and is murder in the second degree, unless the state would elevate the offense to murder in the first degree or the defendant would reduce it to manslaughter or to justifiable killing*". (Italics supplied) ;

and

"* * * if the killing is done though without legal provocation, upon a sudden falling out, but with an instrument *not likely to produce death,* the jury may infer a want of malice, so that it would be regarded as a voluntary manslaughter; *but, if it was done with a deadly weapon it would be murder; the weapon used being controlling as to the intent and malicious motive. Wherefore, a provocation must be*

*measured by the means employed to resent it."*
(Italics supplied).

The several grounds of error set forth in defendant's brief are that the trial court erred: (1) In refusing to sustain defendant's motion made at the conclusion of the State's case to direct a verdict to acquit defendant of murder of the first and second degrees; (2) in refusing to include in the general charge defendant's instruction No. 1 to the effect that if the jury believes from the evidence that decedent attacked defendant or threatened him with murderous assault, which defendant had reason to believe would be made, then defendant had a right to arm himself for defense, and no inference of malice on the part of defendant can be drawn from that fact; (3) in refusing to instruct the jury that malice is an essential element of murder of the second degree; (4) in instructing the jury in the charge upon the law of voluntary manslaughter; (5) in refusing to submit to the jury the law of the right of self-defense; (6) in refusing certain instructions proffered, defining murder of the first and second degrees; (7) in refusing defendant's instruction No. 8, wherein the jury was told that it had the right to take into consideration the relative size and strength of deceased and defendant; (8) in refusing defendant's instruction No. 17 to the effect that the jury could not return a verdict of either murder of the first or murder of the second degrees; and (9) in failing to give defendant's peremptory instruction No. 18.

Initially, because the questions involved may be controlling of the case, we think it advisable to consider assignments of error Nos. 8 and 9, based upon the refusal of the trial court to give defendant's instruction No. 17, to the effect that the jury could not return a verdict of murder either of the first or second degree, and in failing to give defendant's instruction No. 18. We think that the testimony of H. F. Bickel, Sheriff of Webster County, to the effect that at the time of the arrest defendant told this officer that deceased came into the kit-

chen to light a cigarette; that Nora Miller got a cigarette from defendant, who was in bed in his bedroom, went out to light deceased's cigarette from his and that "they got in some kind of scuffle there and he [defendant] saw the gun and Mr. Farley started towards him with the gun and he [defendant] shot him"; and the testimony of Corporal G. F. Parsons, Department of Public Safety, that defendant told him that he shot "Farley as he [Farley] came out of the kitchen", coupled with the position of defendant's body on the floor when the arresting officers arrived, and the improbability of defendant's theory of the case which necessarily arises from the absence of any motive for Farley's alleged attack on defendant, were sufficient to have justified the jury in disbelieving, as it evidently did, the testimony of defendant and the witnesses introduced in his behalf.

The first ground of error is not tenable, for the reason that defendant's motion to direct a verdict to acquit defendant of murder of the first or second degree, made at the conclusion of the State's case, and the court's ruling thereon, were waived by defendant's counsel proceeding to and introducing evidence in behalf of defendant, and at the close of the taking of evidence failing to renew the motion. This Court so held in *State* v. *Zitzelsberger*, 129 W. Va. 229, 39 S. E. 2d 835, decided at this term of Court, and in *State* v. *Chafin*, pt. 2 syl., 78 W. Va. 140, 88 S. E. 657, both misdemeanor cases. In our opinion, the rule should be applied to a felony case.

The rulings of the court in refusing defendant's instructions, assigned in the second and third grounds of error, do not justify a reversal of this case, for the reason that the instructions refused were substantially covered in the court's general charge.

In the fourth and sixth assignments of error, defendant asserts that the trial court erred in instructing the jury upon the law of voluntary manslaughter, and in refusing or failing to incorporate instructions properly defining murder of the first and second degrees. The

pertinent part of the charge involving these two assignments of error reads: "If a killing is done, though without legal provocation, upon a sudden falling out, but with an instrument not likely to produce death, the jury may infer a want of malice, so that it would be regarded as a voluntary manslaughter; but, if it was done with a deadly weapon it would be murder; the weapon used being controlling as to the intent and malicious motive. Wherefore, a provocation must be measured by the means employed to resent it, and the jury should have regard to the reasonableness of the proportion that the provocation bears to the means used, and determine from the evidence and circumstances whether the offense should be reduced or not." The first part of the above-quoted excerpt from the charge is inapplicable to the instant case, for the reason that the instant killing was produced by the use of a deadly weapon, but because the inapplicability thereof was apparent to the jury the error committed by the trial court was not prejudicial. However, we think the trial court erred, as asserted in defendant's sixth assignment of error in instructing the jury that "if it [the killing] was done with a deadly weapon, it would be murder; the weapon used being controlling as to the intent and malicious motive." Under Code, 61-2-1, "Murder * * * by any willful, deliberate and premeditated killing * * * is murder of the first degree. All other murder is murder of the second degree." In *State* v. *Shelton,* 116 W. Va. 75, pt. 2, syl., 178 S. E. 633, this Court held that "Where there was intentional use of a deadly weapon in producing the death of another, the jury may infer malice from the act", the mere use of a deadly weapon in producing death of itself is not murder within the meaning of the statute. Even the intentional use of a deadly weapon is not necessarily malicious. Under the *Shelton* case, it is simply an element from which the jury may infer malice, and, as a corollary, the jury in every trial for murder is at liberty to find that the intentional use of a deadly weapon in producing death was neither malicious nor unlawful, in which case the homicide would be justifiable. Under

this assignment of error, it is well for us to consider that part of the charge which reads that if the jury believes "from the evidence beyond a reasonable doubt that the defendant, Aubrey Boggs, shot and killed the deceased, Thurmond Farley, with a dangerous and deadly weapon, a revolver or pistol, fired by his hand, the law is that such killing was prima facie attended with malice entering into murder, and is murder in the second degree, unless the state would elevate the offense to murder in the first degree or the defendant would reduce it to manslaughter or to justifiable killing". While it is true that Code, 61-2-1, after characterizing certain homicides as first degree murder, reads: "All other murder is murder of the second degree", a homicide is not necessarily murder. The statement in *State* v. *Dodds*, 54 W. Va. 289, 46 S. E. 228, that every homicide is *prima facie* murder of the second degree, is expressly disapproved in *State* v. *Sauls*, 97 W. Va. 184, 195, 124 S. E. 670. In point 8 of the syllabus of the last-mentioned case, this Court held that, "An instruction that the jury may infer malice, the intent to kill, and the willfulness from the unlawful use of a deadly weapon previously obtained, and which omits mention of any of the circumstances of the case which might, in the minds of the jurors, rebut such inferences, is erroneous."; and in point 7, syllabus, "* * * an instruction in the trial of one for murder, which charges the jury that a homicide is presumed to be murder in the second degree, without referring to the particular circumstances of the instant case is abstract and too comprehensive." In *State* v. *Best*, 91 W. Va. 559, pt. 5, syl., 113 S. E. 919, this Court held that an instruction to the effect that "malice might be inferred, without reference to the facts and circumstances calculated to rebut such inference of malice", is misleading. In *State* v. *Bailey*, 103 W. Va. 605, 612, 138 S. E. 202, a case involving a conviction of second degree murder based on an alleged shooting, this Court, citing *State* v. *Sauls, supra*, held that where a "homicide was admitted and justification relied upon, and the jury were told in other instructions that they should consider

all of the evidence and circumstances in arriving at their verdict", the jury could not have been misled by an instruction which told the jury that every homicide is presumed to be murder of the second degree, and in order to elevate the offense to murder of the first degree the burden of proof is on the State, and to reduce the offense below murder of the second degree the burden of proof is on the prisoner. As held in the *Shelton* case, the jury may infer malice from the use of a deadly weapon in producing the death of another only where such use is intentional. Where the use of a deadly weapon is unintentional, the homicide is involuntary manslaughter, or justifiable homicide. The part of the charge immediately under consideration is, in our opinion, improper because it tells the jury that the mere killing with a deadly weapon without regard to whether it was intentional and unlawful is, as a matter of law, malicious, and murder of the second degree. The correct rule, in our opinion, is stated in *State* v. *Bowles,* 117 W. Va. 217, 221, 185 S. E. 205: "Malice and intent could be inferred by the jury from the defendant's use of a deadly weapon, *under circumstances which they did not believe afforded him excuse, justification or provocation for his conduct.*" (Italics supplied). This part of the charge in the instant case may not be considered prejudicial error in view of the fact that the court charged the jury in detail as to the circumstances in which the killing would have been justified.

Assignment of error number five to the effect that the court erred in refusing to submit to the jury the law of the right of self-defense is not sustained by this record. True, defendant offered and the court refused to instruct the jury as to the right of self-defense by one attacked in his own home, but, in our opinion, such an instruction would be inapplicable to the instant case for the reason that decedent at the time he was killed was in the home of his father-in-law, where his wife was staying for the night. In *State* v. *Crawford,* 66 W. Va. 114, pt. 2, syl., 66 S. E. 110, this Court held: "On a trial for murder, instructions to the jury asserting defendant's right to

stand his ground and not retreat, based on the theory of a deadly attack by deceased" on a defendant in his dwelling "are inapplicable where the evidence shows defendant and deceased were at the time of the homicide jointly occupying the house where the killing occurred", and that the ordinary rules as to self-defense alone are applicable. Though the *Crawford* case is not identical with the instant case, the principle stated in point 2 of the syllabus thereof applies here, for the reason that decedent at the time he was killed had a right to visit his wife in the Boggs home, though his actions therein, if defendant's theory of the case be believed, were entirely unjustified.

The court refused to incorporate in the charge defendant's instructions Nos. 6 and 26, or any other charge, which would tell the jury that there was a presumption of innocence in defendant's favor. Such an instruction should have been given. *State* v. *Lowry*, 42 W. Va. 205, 210, 211, 24 S. E. 561; *Widgeon* v. *Commonwealth*, 142 Va. 658, 128 S. E. 459; *Phillips* v. *Commonwealth*, 143 Va. 504, 129 S. E. 259; *Campbell* v. *Commonwealth*, 162 Va. 818, 174 S. E. 856. Clearly in the instant case where, as heretofore suggested, the court has instructed the jury that the killing with a dangerous and deadly weapon "was prima facie attended with malice entering into murder", refusal of the instructions on the presumption of innocence is prejudicial.

Defendant, in our opinion, was not prejudiced by the trial court's refusal to give at defendant's request, an instruction which would have told the jury that it had a right to take into consideration the relative size and strength of deceased and defendant. As the record discloses that both parties were armed at the time of the fatal shooting and did not engage in mutual physical combat, the question of their relative size and strength is immaterial to the matters in issue before the jury.

For the reasons heretofore stated, we are of opinion

that the judgment of the trial court should be reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*

Fox, Judge, concurring:

I concur in the reversal of the judgment of the trial court, the setting aside of the verdict on which the said judgment was based, and in awarding to the defendant a new trial; but I am not in accord with certain holdings made, and certain opinions expressed in the majority opinion.

(1) I do not agree that the introduction of evidence by the defendant, after his motion to direct a verdict of acquittal of murder of the first or second degree, made at the end of the State's case in chief had been overruled, should be held to be a waiver of the error, if any, in the court's action on said motion. I think the defendant had a right to the full benefit of his motion, and that no prejudice should attach to his subsequent introduction of evidence to sustain his defense. I agree that the rule announced has long prevailed in civil cases and, more recently, has been extended to misdemeanor cases; but I do not think it should be further extended to cases where a felony is charged. In all felony cases either life or liberty is at stake, and a defendant should not be held to have waived any motion, or any defense merely because, when he fails as to such motion or defense, he proceeds along other and different lines. A defendant charged with a felony should have the right to make his defense, and without being required, as a condition thereof, to surrender or waive any defense interposed by him at any stage of the trial. I think, however, that in this case the point is academic, because, in my opinion, the motion aforesaid made by the defendant was properly overruled.

(2) Whether an instruction in a trial for murder to the effect that malice might be inferred, without reference to facts and circumstances calculated to rebut such inference, should be given, depends upon the evidence

and circumstances of the case, and the scope of other instructions given. *State v. Bailey,* 103 W. Va. 605, 138 S. E. 202. I do not think the jury could have been misled by the instruction on malice given in this case.

(3) I do not agree with the discussion contained in the majority opinion with respect to intent entering into the commission of a homicide, which may be either murder of the second degree or manslaughter. While perhaps not so intended, the discussion is, I fear, calculated to give rise to the belief that this Court feels that we should abandon the old and heretofore accepted idea that intent may be inferred from the acts of an accused, where a homicide has occurred, and substitute the idea that intent must be proved in some other manner. I have always understood that, as to both intent and malice, neither can be established by direct evidence, because a jury cannot read the mind of a defendant. A jury may always infer intent or malice from a defendant's acts and conduct. In both civil and criminal law, one is always held to intend the natural and probable consequence of his act. If and when we abandon these well established principles, we inject into criminal trials an element not heretofore considered susceptible of practical solution. Of course, there can be no crime without a criminal intent; but intent is inferred from acts and conduct and requires no further proof, as indeed no other proof can be secured. In *State* v. *Morrison,* 49 W. Va. 210, 38 S. E. 481, it was held: "A specific intention to kill is not essential to murder in the second degree, but it is essential in murder in the first degree."

(4) I find no fault with that part of the trial Judge's charge in which he says: "The court further charges the jury that if they believe from the evidence beyond a reasonable doubt that the defendant, Aubrey Boggs, shot and killed the deceased, Thurmond Farley, with a dangerous and deadly weapon, a revolver or pistol, fired by his hand, the law is that such killing was prima facie attended with malice entering into murder, and is murder in the second degree, unless the state would elevate the offense to murder in the first degree or the defendant

would reduce it to manslaughter or to justifiable killing." As I understand the law, where one person, with a deadly weapon unlawfully kills another, it is presumed to be murder of the second degree. I do not believe that the language "the law is that such killing was prima facie attended with malice entering into murder" conveys any different meaning than if the court had said "the law is that such killing is murder of the second degree", and if he had so stated, the instruction would have been proper, because in the same instruction he adds the qualifying clause which would have permitted the defendant to reduce the offense to manslaughter or justifiable killing.

(5) I think the giving of that part of the court's charge which contains the language: "* * * if the killing is done though without legal provocation, upon a sudden falling out, but with an instrument not likely to produce death, the jury may infer a want of malice, so that it would be regarded as a voluntary manslaughter; but, if it was done with a deadly weapon it would be murder; the weapon used being controlling as to the intent and malicious motive. Wherefore, a provocation must be measured by the means employed to resent it", was error. I would not find fault with that part of the instruction which refers to a "sudden falling out", and the use of an instrument not likely to produce death, which "sudden falling out" is connected with voluntary manslaughter and second degree murder, had the court said that if, on such "sudden falling out" a killing occurred through the use of a deadly weapon, it would be presumed to be murder of the second degree. I think that, under our statute and our decisions, unlawful homicide following a sudden falling out, if committed with a deadly weapon, is presumed to be murder of the second degree; and the elements of "sudden falling out" or "hot blood" constitute a defense, which would warrant a jury in reducing a defendant's guilt to voluntary manslaughter or some lesser offense, or to find that the act was justifiable. However, the court did not use such language or its

equivalent in his charge, but said, "but, if it was done with a deadly weapon it would be murder." There is a wide difference between saying that a particular act would be murder and saying it would, under the law, be presumed to be murder of the second degree. Presumptions may be overcome, and a defendant should not be deprived of the right to have a jury pass upon the question whether the presumption against him of murder of the second degree should be sustained or overcome. For these reasons, I concur in the opinion prepared by Judge Riley on this point of the case.

(6) I, concur also in point 4 of the syllabus which states: "The court's refusal to incorporate in its charge in a trial for murder an instruction bearing on the presumption of innocence in defendant's favor constitutes prejudicial error." In my opinion, when a defendant asks that the jury be instructed on the question of presumption of innocence, as was done in this case, it becomes the duty of the court to include in his charge the substance of such an instruction. The question may arise whether failure to give such instruction is prejudicial error, in view of the fact that, in this case, the court's charge told the jury that the indictment was not to be considered as evidence against the defendant, and that before convicting defendant they must believe him to be guilty beyond all reasonable doubt, thus placing upon the State the heavy burden of showing defendant's guilt. But over a long period of time, reaching beyond the memory of any member of this Court, the principle that a defendant, in a criminal trial, is presumed to be innocent, and that this presumption follows him through every stage of his trial, is so imbedded in our system of criminal law, that I can see no reason why we should now depart from it. I do not think it would be error in a trial court to fail to give such an instruction, when not asked to do so; but when request therefor is made, I think an instruction along that line should be given.

Judge Lovins concurs in the foregoing note.