STATE OF WEST VIRGINIA

v.

WALTER L. CURREY

(No. 10196)

Submitted January 31, 1950. Decided February 21, 1950.

*William P. Samples,* for plaintiff in error.

*William C. Marland,* Attorney General, *Thomas J. Gillooly,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

Walter L. Currey prosecutes this writ of error to a judgment of the Circuit Court of Taylor County, overruling his motion to set aside a jury verdict finding him guilty of "unlawful shooting and wounding" one Charles R. Weaver, and imposing a sentence of one to five years in the penitentiary.

The indictment, drawn under Code, 61-2-9, charges that defendant on the _____ day of July, 1948, and within one year preceding the finding of said indictment, "did unlawfully, maliciously and feloniously shoot and wound one Charles R. Weaver, and cause him bodily injury, with intent to maim, disfigure, disable and kill him, the said Charles R. Weaver, against the peace and dignity of the State."

The factual situation was developed by State's witnesses alone. The defendant did not go on the witness stand, but put in evidence the testimony of three character witnesses. Defendant, who resides at Currey Ridge in Taylor County, West Virginia, spent the winters of 1947-48 and 1948-49 in Florida. Prior to going south in 1947, through an advertisement in a Fairmont paper, he contacted Guy B. Weaver, a boy of fifteen years, who agreed to accompany him and help him with his automobile and trailer. Young Weaver, apparently with the approval of his parents, went to live with Currey at his home on Currey Ridge, and attended a public school in Grafton until late in October, 1947, when he and Currey left for Florida. On arriving in Florida the boy was enrolled in a school there. However, in April, 1948, Guy, having had some disagreement with Currey, left and, giving to the enlistment officer his age as eighteen years, joined the United States Marine Corps. Currey made repeated efforts to get him released, without avail.

Between the time Currey returned to his home in Taylor County early in 1948 and July 25, 1948, the date of the shooting, he made threats to the effect that he intended to kill Guy B. Weaver. Charles Cather, one of the boy's former teachers, who had been requested to write to Guy in April or May to try to get him out of the service, testified that on several occasions Currey told him that he would kill the "so and so," giving as his reason for such threats that the boy had left his employment. On either the first or second Sunday in July, 1948, defendant, according to Edgar T. McKee, steward at the American Legion Home in Grafton, told McKee that he was meeting every bus that it was possible for him to meet, looking for the return of this boy "he had taken to Florida," as he "was going to kill him."

At the time of the shooting on July 25, 1948, Guy was at his parents' home on Route No. 119, at a place called Haymond, on furlough. About 2:30 o'clock in the afternoon of that day, Guy, his brother Paul and three cousins, Charles, Dorsey and Leroy Weaver, went to a radio show at a park which was located on Route No. 119 (Wickwire Road). The boys state that Currey was there, and that Guy avoided him. Guy testified that while he was at the soft drink counter defendant said he wanted to see him, and that he turned away. Later, about four or four thirty in the afternoon, the five boys started home, going east on Wickwire Road. When they had reached a point on the road across from the house of one Poe, they were overtaken by defendant in his automobile. The boys were on their left side of the road. Paul, Guy and Charles were some ten feet ahead of the other two boys. On coming abreast of Paul, Guy and Charles, defendant attempted to talk with Guy. Guy told him he did not want to talk with him, and defendant said "come here. I want to talk to you." Upon being requested again, Guy told defendant "to drive upon the hill and roll down the other side." At this point defendant said "maybe you will," pulled out a pistol, and started to fire into the group. All the boys deny that defendant was threatened in any way.

The two or three shots were fired from the window to the left of the defendant, who was in the driver's seat of the car. One of the bullets entered Charles' ankle, its course being downward. Charles was probably a little farther from the car than the other two boys. Upon the firing of the first series of shots, Guy and his brother Paul started to run for a barn or shed, located to the right of the roadway going east and to the east of the Poe house. Both Guy and Paul testified that Currey followed them, and, as they cleared the bars of a fence, and ran back of the shed, Currey fired a couple more shots in their direction. Charles, having been hit, was not able to follow Guy and Paul. He was picked up by Mike Thorn, who came on the scene on the highway from the east, and was taken to a hospital.

After Trooper Sergent got word of the shooting, he contacted Trooper Duckworth, and the two went to the radio park. After inquiring about the reported shooting, the officers started to search for Walter Currey. When they found him, he was out on his property standing near the trailer, with a pistol. He told the officers that he was going to kill himself, but was finally persuaded to hand the pistol to Joe Hays, who took it into the trailer. After taking defendant to jail, Sergent and Duckworth, together with Hays, returned to the Currey property. Hays went into the trailer and returned with a pistol, which he turned over to the officers, which pistol was introduced in evidence at the trial. During the trip to the jail, defendant told the officers he was going to kill the "son-of-a-bitch"; that he said "I am going to kill him, I have done everything for him, and even bought him a motor scooter."

The trial was continued generally on defendant's motion on September 20, 1948, and on January 13, 1949, respectively, primarily on the ground of the absence of Joe Hays, claimed to be a material witness, who, defendant represented, was in the automobile with him at the time of the alleged shooting and who would testify, along with other facts, that defendant did not shoot the prosecuting witness with intent to maim, disfigure, disable and kill

him. Four days prior to April 18, 1949, the date the case was set, that is on April 14, 1949, subpoenas were issued on behalf of both the State and the defendant, directed to the Sheriff of Logan County, in which county it was thought Hays was then located, calling for the appearance of Joe Hays on the 18th day of April, 1949. The prosecuting attorney's transmittal letter to the Sheriff of Logan County was returned with the following notation: "4-18-49. We did not rec. this in time to serve it. If you want it Served for another date let us know."

On April 18, 1949, the prosecuting attorney and defendant, in person and by counsel, appeared in court and the defendant moved the court for a continuance of the case until the next regular term because (1) of the condition of defendant's health, and (2) the absence of Joe Hays, a material witness, living in Man, Logan County, West Virginia. Presented in support of the first ground for a continuance was an affidavit, executed on April 9, 1949, by a doctor in Daytona Beach, Florida, certifying that defendant had been under his care since December, 1948; that he had definite signs of cardiac-decomposition with moderate dyspnea, severe edema of the ankles and a systolic murmur; that continued treatment had been necessary and that he felt "it is not advisable for Mr. Currey to travel at this time." An order was entered overruling the motion in so far as defendant's physical condition was concerned; but as to the absence of the witness, Joe Hays, which was resisted by the prosecuting attorney and on which evidence and arguments were heard, the court took time to consider, continuing the case to April 20.

On April 21, the motion of April 18 for a continuance was, in effect, renewed, the matter of defendant's health being supplemented by an examination made by Dr. Irving J. Hanssman of The Myers Clinic at Philippi, bearing date April 19, 1949, to the effect that defendant had been suffering for the past three years from hypertension, as shown by the records of the clinic; that he was taking digitalis for a cardiac condition and weekly injections of a mercurial diuretic for control of ankle edema. This

motion was overruled. Thereupon a jury was impaneled and a trial had.

At the close of the State's case, defendant moved the court to strike the State's evidence, and direct a verdict of not guilty "for the reason that the evidence has failed to show any intent on the part of Mr. Curry to shoot Charles Weaver, who is the prosecuting witness in this case, and for the further reason the threats which were made by Mr. Currey, if they were made, was against Guy B. Weaver and not the prosecuting witness in this case, and for the further reason that the witnesses have all stated that they did not know who Mr. Currey was shooting at, if he was shooting at anybody on the Wickwire Road on the 25th of July, 1948." The court overruled this motion.

While the defendant assigns a number of errors dealing with the court's rulings on continuance, instructions, admission and rejection of evidence, they may be considered in three general groups, as follows: (1) The overruling of motions for continuance; (2) the matter of a claimed variance between the crime charged in the indictment and the evidence introduced thereunder; and (3) the court's rulings on instructions.

Considering the indictment by itself it seems clear that it was drawn under Code, 61-2-9, dealing with malicious or unlawful wounding. It is in the usual form under the statute, and the instructions given at the instance of the State bear this out. However, counsel for the defendant contends that in view of the evidence it is clear that defendant intended to shoot Guy B. Weaver, and, therefore, the indictment should have been drawn under Code, 61-2-10, dealing with assault during the commission of or the attempt to commit a felony.

A reference to the colloquy between the State's attorney and the defendant's attorney before the trial court on April 18, 1949, in regard to defendant's right to a continuance will clarify defendant's position. At that time the prosecuting attorney spoke of having a witness in the

armed services, meaning Guy B. Weaver, and that he might not be available at a later time. Counsel for defendant stated that Charles R. Weaver was within the jurisdiction of the court, and that Guy B. Weaver's case was a different one. Whereupon, the prosecuting attorney stated the State's position to be that "The State charged Walter Curry with the malicious and unlawful shooting of one Charles R. Weaver. In order for the State to sustain that charge, the State will attempt to prove by the evidence that Walter Curry intended to kill, maim, disfigure, and disable one Guy B. Weaver who is the witness the State referred to as being in the armed forces, and in so attempting to shoot one Guy B. Weaver he shot one Charles R. Weaver."

The evidence shows clearly that the defendant shot and wounded Charles R. Weaver with intent to shoot and kill Guy Weaver. Moreover, Charles R. Weaver and defendant were not acquainted with each other. The fact that the evidence shows that Charles R. Weaver was accidentally hit by a bullet intended for Guy B. Weaver, does not create a variance between the evidence and the charge in this case, under the rule laid down in State v. Meadows, 18 W. Va. 658. In point 8 of the syllabus in the above-mentioned case, this Court, in dealing with the same statute and similar facts held: "If A is indicted for shooting C with intent to maim, disfigure, disable and kill him, and the proof is, that he shot at B and missed him and accidentally hit C, he can be convicted on such indictment for shooting C with intent to maim, disfigure, disable and kill him." As stated in the body of the opinion in State v. Meadows, supra, at page 670: "The rule is well settled, that if one person shoot at another with intent to kill him and miss that person and kill a third person, it is murder. The malicious intent towards the second is transferred to the third upon the well-settled principle, that a man shall be presumed to intend that, which he actually does."

The proof being sufficient to support a conviction under Code, 61-2-9, the matter of variance, as contended for on behalf of defendant, is without merit.

Was the court in error in overruling defendant's motions for a continuance at the April, 1949, term? In regard to the absent witness the defendant stated that the witness would testify that defendant did not shoot at Charles. As heretofore indicated in our discussion relative to variance, this evidence would not aid the defendant's defense in any particular. As to the matter of defendant's health, it appears that the defendant made the trip from Florida to Grafton successfully, was before the court at the time the motion for a continuance was made and present for and during the trial; and that he is probably in as good health as he will ever be. Matters of continuance are addressed to the sound discretion of the trial court. We do not see that the court has abused its discretion in this regard. A motion for a continuance in a criminal case is addressed to the sound discretion of the trial judge, and, though subject to review, a refusal to grant a continuance will not constitute a ground for reversal, unless it may be made to appear that this discretion was abused, and that its refusal worked injury and prejudice to the right of the party in whose behalf the motion was made. *State* v. *Olivetti,* 107 W. Va. 357, pt. 1 syl., 148 S. E. 205. See also *State* v. *Simmons,* 130 W. Va. 33, pt. 1 syl., 42 S. E. 2d 827; *State* v. *Padgett,* 93 W. Va. 623, pt. 1 syl., 117 S. E. 493.

The defendant assigns as error the giving of State's instructions Nos. 4 and 5; the refusing of defendant's instruction No. 5; and the modifying of defendant's instructions Nos. 2 and 6.

State's instruction No. 4 reads: "The court instructs the jury that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if they believe from the evidence beyond a reasonable doubt that the defendant, Walter Currey, without any or upon slight provocation, wounded Charles R. Weaver by the deliberate use of a deadly weapon likely to produce death under the circumstances, the presumption of the law arising in the absence of proof to the contrary is, that he intended the consequences that re-

sulted from the use of said deadly weapon." We see no error in this instruction.

In so holding we distinguish this case from that of *State v. Foley*, 131 W. Va. 326, 47 S. E. 2d 40, in which this Court held in point 5 of the syllabus that, in a case where a defendant is being tried on an indictment under which he may be convicted of voluntary manslaughter, it is erroneous to charge the jury that: " '* * * if you believe beyond a reasonable doubt that the defendant, E. H. Foley, shot and killed the deceased, Joseph Groves, with a dangerous and deadly weapon, a revolver or pistol, fired by his hand, the presumption of law is, without further showing, that the defendant is *prima facie* guilty of voluntary manslaughter * * *,' was prejudicial to the defendant, and constituted reversible error." Likewise this case should be distinguished from *Holley* v. *Purity Baking Co.*, 128 W. Va. 531, 37 S. E. 2d 729, in which this Court, in point 3 of the syllabus, held that it is reversible error to instruct the jury that if it should find from a preponderance of the evidence that plaintiff sustained injuries as the proximate result of attempting to eat food, manufactured by defendant, contained in defendant's original package, and purchased by plaintiff consumer from one of defendant's distributors, "there is 'a *prima facie* presumption *of law* that said defendant was guilty of negligence.' (Italics supplied)." In the latter case, this Court held that a presumption of law is a rule of law. To like effect see *State v. Reppert*, 132 W. Va. 675, 52 S. E. 2d 820. So the instructions in the *Foley* and *Holley* cases, in that they told the jury, as a matter of law, to find in favor of the party offering the instructions on the ultimate issue in the case, were clearly erroneous.

Though the instant instruction contains the words "presumption of law arising in the absence of proof to the contrary," it does not tell the jury to find the defendant guilty of malicious or unlawful wounding: it simply tells the jury that it is a rule of law arising in the absence of proof to the contrary, that defendant "intended the consequences that resulted from the use of said deadly weapon." We

think it is sound to say, as the instruction told the jury, that in the absence of proof to the contrary, as a matter of law, one intends the consequences that resulted from the use of a deadly weapon. From its inception in point 11 of the syllabus of *State* v. *Cain,* 20 W. Va. 679, the use of the words in an instruction in a trial on an indictment for murder, malicious or unlawful wounding, and other crimes of violence, that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act, has many times been incorporated in instructions. See *State* v. *Reppert, supra,* page 832. In the instant instruction the words "the presumption of law arising," are qualified by the words "in the absence of proof to the contrary," and though a presumption of law, as held in the *Reppert* and *Holley* cases, is a rule of law, the qualifying phrase in the instant instruction "in the absence of proof to the contrary" shows clearly that the trial court was speaking of a rebuttable presumption, that is, a presumption of fact. So using the qualifying words, it seems clear that the jury could readily understand from the instant instruction that the defendant, having used a deadly weapon in wounding the prosecuting witness, was under the duty in the first instance to show that the use was lawful. This does not take from the State the burden of proving defendant's guilt beyond a reasonable doubt, because the defendant, by wounding the prosecuting witness with a deadly weapon, was under the duty to explain his unusual act. To the effect that malicious or unlawful intent may be inferred from the unexplained wounding of a person with a deadly weapon, see *Johnson* v. *Commonwealth,* 135 Va. 524, 115 S. E. 673, 30 A. L. R. 755. See generally *State* v. *Boggs,* 129 W. Va. 603, 42 S. E. 2d 1.

State's instruction No. 5, in our opinion, was properly given. See *State* v. *Davis,* 74 W. Va. 657, 662, 82 S. E. 525. It is to be noted that the instant instruction permits the jury to determine whether defendant was guilty of one of two separate offenses, namely, malicious wounding and unlawful wounding, and that in the case of *State* v. *Sim-*

*mons, supra,* pt. 3, syl., 130 W. Va. 33, 42 S. E. 2d 827, holds that "Code, 61-2-10, defines one crime, and in a trial on an indictment charging violation of that statute only one of two verdicts may be returned: guilty or not guilty." So we think this case is to be differentiated from the *Simmons* case, and that the instruction does not violate any legal postulate in that case.

Defendant's instruction No. 5, refused, would have told the jury, in effect, that in order to convict defendant of any offense, it must be satisfied beyond a reasonable doubt that defendant did unlawfully, maliciously and feloniously shoot Charles R. Weaver "with intent to maim, disfigure, disable and kill the said Charles R. Weaver." *State* v. *Donohoo,* 22 W. Va. 761, 764, is cited by counsel for defendant for this instruction. In that case the defendant was indicted for shooting with intent to kill one William Canter. The jury was instructed "that in order to convict defendant of any offense in this case, they must be satisfied beyond a reasonable doubt, that defendant did maliciously or unlawfully shoot, beat, wound, or ill-treat Wm. Canter, with intent to maim, disfigure, disable or kill said Wm. Canter." That instruction was clearly proper in that case, because the person defendant Donohoo intended to shoot was the person named in the indictment as being the victim of defendant's intended malicious or unlawful wounding. The instant instruction, if given, would have stated a rule of law contrary to the holding of this Court in *State* v. *Meadows, supra.*

We observe no error in the trial court's modification of defendant's instruction No. 2. This instruction as originally offered, the part deleted by the trial court being indicated by italics, is as follows: "The court instructs the jury that under the statute the crime of malicious assault consist of an act combined with the particular intent 'to maim, disfigure, disable or kill.' This intent is the very gist of the offense, and without it there can be no conviction, and the burden is on the State to prove such in the case, either by direct or circumstan*iol* evidence, *and no intent in law or mere legal presumption differing from the intent*

*in fact, can be allowed to supply the place of the latter,* and unless the State prove such intent, the jury should find the defendant not guilty." This instruction, as modified, fully states the law governing malicious wounding, and defendant was not, in our opinion, prejudiced by the modification.

Likewise defendant was not prejudiced by the modification of his instruction No. 6, which, with the portion of the instruction deleted by the court indicated by italics, reads as follows: "The court instructs the jury that good character is an important fact with every man and never more so than when he is put on trial charged with an offense which is rendered improbable in the last degree by a uniform course of life wholly inconsistent with any such crime. *There are cases when it becomes a man's sole dependence, and yet may prove sufficient to outweigh evidence of the most positive character.* The jury are therefore instructed that evidence of good character is a substantial fact, like any other fact tending to establish the innocence of the defendant, and if the jury believe that the evidence of good character of the defendant, as proven in this case, is sufficient to raise a reasonable doubt as to his guilt, when considered along with all the evidence in the case, then they shall acquit the defendant." This instruction, as modified, in our opinion, fully gives to the defendant the benefit of proving and submitting to the jury the good character permissible in criminal cases. The deleted part of the instruction, that is, "There are cases when it becomes a man's sole dependence, and yet may prove sufficient to outweigh evidence of the most positive character" is taken from an opinion written by Mr. Justice Cooley, in *People* v. *Garbutt,* 17 Mich. 9, 97 Am. Dec. 162, which is quoted in *State* v. *Moyer,* 58 W. Va. 146, 152, 52 S. E. 30; *State* v. *Padgett,* 93 W. Va. 623, 117 S. E. 493; and *State* v. *McDermott,* 99 W. Va. 202, 128 S. E. 108. The part of defendant's instruction No. 6 deleted by the modification thereof, though in the quotation from Mr. Justice Cooley's opinion contained in the *Moyer, McDermott* and *Padgett* cases, has not been held by this court as a require-

ment of an instruction on good character. An instruction on good character, as approved in *State* v. *McDermott, supra,* on pages 222 and 223, is similar to the modified instruction under appraisement here. In the *McDermott* case at page 225, Judge Lively said: "But where there are other circumstances and facts militating against guilt, good character is held to be a fact which may serve to create reasonable doubt" (citing *State* v. *Morrison,* 49 W. Va. 210, 218). The modified instruction goes further than Judge Lively's statement in the *McDermott* case, where it permits the jury to find that defendant's good character, when considered with all the evidence in the case, is sufficient to raise a reasonable doubt as to defendant's guilt, the jury shall acquit the defendant.

The judgment of the Circuit Court of Taylor County is affirmed.

*Affirmed.*