# CHARLESTON.

STATE v. HUGH B. 'BRIDGEMAN et al.

Submitted March 15, 1921.   Decided March 22, 1921.

1.  CRIMINAL LAW—*Elements Necessary for Continuance for Absence of Witnesses Enumerated.*

    A motion for continuance based on the absence of a witness is addressed to the sound discretion of the court, and it must be shown to the satisfaction of the court that the witness is material and that due diligence has been used to obtain his attendance, and that his evidence would not be cumulative. (p. 236).

2.  SAME—*Appellate Court Will Not Reverse Denial of Continuance for Absence of Witnesses Unless for Abuse of Discretion.*

    Where a continuance because of the absence of a witness has been refused, the appellate court will not reverse unless it clearly appears that the trial court has abused its sound discretion.   (p. 236).

3:  LEWDNESS—*Evidence Sustaining Conviction of Lewd and Lascivious Cohabitation.*

Proof that a man and woman not married to each other, occupied together two adjoining rooms with a door in the partition between, for approximately one year, where they slept and took their meals, she doing the cooking and other domestic work and acting as assistant to him in his profession as a dentist, conducted in offices adjoining the two living rooms, at a wage of $10.00 per week; and that she stated to various visitors that they were married, and on one occasion introduced him to her brother-in-law as her husband, he taking no exception to the introduction, but tactitly assenting thereto; that on one occasion they were found sleeping together in one of the rooms; that a boy baby was born to her there after she had been living in the rooms for approximately ten months, of which baby he seemed to be very fond, and to which he called himself "daddy"; that on one occasion he came into the room when she had just arisen from bed, and remained until she dressed without apparent embarrassment to either, "same as any man might happen to run in on his wife if she would be dressing"; is sufficient to constitute the offense of lewd and lascivious cohabitation under sec. 7, chap. 149 of the Code.   (p. 239).

Error to Circuit Court, Harrison County.

Hugh B. Bridgeman and another were convicted of lewd and lascivious cohabiting together, and they bring error.

*Affirmed.*

*Charles G. Coffman,* for plaintiffs in error.

*E. T. England,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

Hugh B. Bridgeman and Eula Miller were indicted, tried and convicted in the Criminal Court of Harrison County of lewd and lascivious cohabiting together and with each other, and the former was adjudged to pay a fine of $100.00 and was sentenced to confinement in the jail at hard labor for 30 days; and the latter was fined $100.00; both sentences being imposed on the first day of December, 1917.

Defendants assign as error:   (1) The refusal of the court

to continue the case; (2) the court's refusal to permit certain evidence offered by the defendants to go to the jury; (3) the court's refusal to set aside the verdict on the ground that the evidence was insufficient to convict.

Bridgeman is a dentist, and had rented four adjoining rooms on the second floor of the Elk Bridge Building in Clarksburg, the first two of which rooms he used for dental offices, and the other two, which were adjoining, all being in one suite, he occupied as living rooms. The room next to those used for offices was furnished with a bed, piano, dresser, chairs and the like, and the other room, the back room, was used as a dining room, in which was a table, a kitchen cabinet, a davenport, and it was otherwise fitted up for a kitchen and living room. In July, 1915, he employed Eula Miller to assist him in his dental work at $6.00 per week. At that time she was 17 years old and resided with her father on Baltimore Street, about ½ mile from the Elk Bridge Building. In September, 1916, she began living in these two living rooms occupied by Bridgeman, and was yet residing there at the time of the trial. In May, 1917, she was delivered of a boy baby. The following August both defendants were arrested and bound over to answer an indictment for the offense for which they were convicted, were indicted at the succeeding November term of the criminal court of that county and tried and convicted at that term. Mrs. Cozad, a sister of Eula Miller, testified that she visited her sister at these living apartments of Dr. Bridgeman quite often before defendants were arrested in August, 1917, when she saw her sister doing the cooking and house work; that she had been there as much as two days and two nights at a time, and saw no one else rooming there or staying there at any time except the defendants; that on one occasion she saw them in bed together in the room which contained the piano, and which room opened into the kitchen, where she, witness, slept on the davenport. Eula Miller stated to the witness that she and Dr. Bridgeman were married, but Doctor Bridgeman never made such a statement. She was there at noon nearly every day for a considerable period when she

worked at Gribble's store, in the near vicinity. She saw
Bridgeman take his meals at the apartment, and always con-
sidered, but was in doubts, as to whether the defendants
were married, as she had heard that Bridgeman was married
to some other woman. Mrs. Hattie Wallace testified that she
was a sister of Eula Miller and visited the Bridgeman apart-
ment in the summer of 1916, and on one occasion when she
was there her sister was in bed in the room adjoining the
dental offices, and had just got up without much clothing
on, when Dr. Bridgeman came in the room and remained
while she was dressing, "same as any man would happen to
run in on his wife if she would be dressing; and he called
himself daddy to the baby and asked me what I thought about
it and he called me 'aunt' to it, which I suppose I am."
The defendant, Eula Miller, told her that she and Doctor
Bridgeman were married. Mrs. Lena Ice, another sister
of Eula Miller, testified that she visited her sister at the
apartment one evening in November when Dr. Bridgeman
came to town on a late train, and came to the apartment,
when her sister Eula cooked his supper for him and after
supper they accompanied her across the bridge to Pike Street,
where they met Mrs. Ice's husband, to whom Eula Miller in-
troduced Doctor Bridgeman as her husband, and the doctor
acknowledged the introduction. On that occasion her sister
told witness that she and Dr. Bridgeman had been married
in Cincinnati, and she, Eula, thought that they would rent
a house and furnish it in the near future. This was before
the baby was born. Mrs. Effie Wamsley, another sister,
stayed at the Bridgeman apartments about three or four
weeks while Eula Miller lived there, and slept in the rear
room on the davenport a portion of the time, and sometimes
in the bed in the other room. At that time, which was in
September, 1916, she usually slept with her sister and her
husband slept with Dr. Bridgeman. Her husband ate his
meals at the apartment, but not all of the time, and when
she and her husband slept together she did not know where
Dr. Bridgeman slept. She never saw him and her sister
sleeping together. Her sister did go into the other room at

the retiring hour and frequently Dr. Bridgeman would go into the same room either before or after, but she could not tell whether or not he continued to stay in that room all night. Eula Miller stated to this witness also that she and Dr. Bridgeman were married. The testimony of Clyde Wamsley, the husband of Effie Wamsley, was practically the same as that of his wife. Mrs. Cozad, who visited the defendants at their apartments possibly more often than any other witness, stated: "They lived there seemingly the same as the rest of my sisters and their husbands." She testified that defendants got their meals there, her sister doing the cooking and the house work and he was staying with her. G. W. Miller, the father of Eula, testified that after his daughter quit coming home at night and began to stay at the Bridgeman living rooms he went to see Dr. Bridgeman about the matter and remonstrated with him and asked him not to take automobile trips at night with her and "do things like that" as it would cause people to talk about them. At that time the doctor promised him that he would not do so any more. His daughter told him that they were married. He frequently visited them at the living rooms when the doctor came in and took his meals there. After some trouble had arisen and he became suspicious that they were not married, he went up to the apartments and had a talk with them and they requested him to stop any trouble, stating that they would have everything in "shape" and would be married the following September.

All of the witnesses for the State who visited the defendants at their apartments were under the impression, from their conduct and manner of living, that the defendants were married and were living together as man and wife. Quite a number of them testified to the actions of Dr. Bridgeman after the baby was born, stating that he held himself out to be the father of the child and was proud of its size and looks, nursed it and seemed to be very proud of it.

On the other hand the defendants are positive in their statements that they never lived together as man and wife, never held themselves out to be married, never occupied the

same bed together, and that they had no illicit intercourse. She denies that he was the father of the child. Dr. Bridgeman denies that he was introduced to Mrs. Ice's husband as the husband of Eula Miller; and Miss Miller denies that she ever told any of her sisters or her father that she was married. As is usual in such cases, there is a flat contradiction between the witnesses for the State and the defendants. Dr. Bridgeman testifies that he employed Miss Miller to assist him in his profession at $6.00 per week and afterward paid her $12.00 per week for a time, until she began living at his apartments, when he paid her $10.00 per week; that he rented these four rooms and paid therefor the sum of $1,000.00 at intervals of three months; that he boarded elsewhere than at the apartments; paid no bills for Miss Miller, either for clothing or for groceries, and did not furnish any money for those purposes. He testified that he took his meals at various restaurants, and, after he was arrested in August, rented a room, nearby his office, which he had occupied from that time until the trial. He flatly denies that he is the father of the illegitimate child or that he ever held himself out to be such, either by word or deed. On this conflicting evidence the jury found defendants guilty.

When the case was called for trial defendants moved the court for a continuance on account of the absence of Lee Rogers and Harold Dunn, claimed to be important witnesses, without whose evidence they could not safely go to trial. Rogers had been summoned, but Dunn had not been found by the sheriff. A rule was issued against Rogers and he afterwards appeared and gave his testimony, which was not important. Bridgeman was under bond to answer the indictment, and, after the indictment was found, he did not have subpoenas issued for his witnesses until four days after. He knew Dunn very well and testified that he had lived with him at his apartments during most of the time that Miss Miller lived there, and that this witness had been at Clarksburg up until about the time of the trial, but that he did not know what had become of him. He stated that this witness lived in East End, Industrial, an addition to the city of

Clarksburg. As an excuse for not having his witnesses summoned promptly, he stated that this witness had been around town all the time and he supposed that he would be on hand at the trial or would be within reach of the sheriff when process was issued. Under such circumstances the court in its discretion refused to continue the trial, presumably because the defendant had not shown the proper diligence in preparing for the trial. It is pertinent to state that it does not appear from the testimony of any of the witnesses who visited the apartments of Dr. Bridgeman while Miss Miller lived there that the absent witness, Dunn, was ever seen there. It is well settled that a motion for continuance is addressed to the sound discretion of the trial court, under all of the circumstances of the case; and unless it is clearly shown that the lower court has abused its discretion, and it is reasonably clear that an injustice has resulted, the appellate court will not review the holding of the lower court. It must be clear that the defendant has been prejudiced by the refusal of the continuance before the appellate court will reverse because a continuance is not granted. *State* v. *Harrison,* 36 W. Va. 729; *Bank* v. *Ralphsnyder,* 54 W. Va. 231; *State* v. *Jones,* 53 W. Va. 613; *Hewitt* v. *Commonwealth,* 17 Gratt. 627; *Fiott* v. *Com.,* 12 Gratt. 576.

In the case of *State* v. *Harrison,* Judge BRANNON says: "The judge presiding sees all the surroundings of the trial, and can better than we decide whether the design of a motion for a continuance is delay; or whether a continuance is really essential to a fair and proper trial." In the case of *Ohio Valley Bank* v. *Berry,* 85 W. Va. 95, it is held: "A motion for the continuance of a cause is always addressed to the sound, but not arbitrary, discretion of the court, and when based on the absence of a witness depends on the diligence employed to obtain his presence and the materiality of his evidence, and a judgment denying such motion must plainly appear to be erroneous, to justify a reversal thereof. There is no presumption of due diligence in such cases, from the mere suing out of summons for an absent witness. Diligence to obtain his presence must be affirmatively shown, as

well as the materiality of his evidence if present, and that it will not be merely cumulative of other evidence, must also affirmatively appear.'' Under the circumstances of this case we cannot say that the trial court abused its discretion in refusing a continuance.

Defendants attempted to show by cross-examination of G. W. Miller that on one occasion a dispute arose between him and Eula, his daughter, while she was at home, over whether the daughter or a niece should clean the parlor or wash the dishes, and as a result of the dispute he struck Eula over the head with a thin board several times, breaking the board into several pieces. The witness began telling about the occurrence, saying that he was correcting her for some of her misdoings and for ''sassing'' him, and although angry, he did not hurt her, when, upon objection, the court refused to permit further testimony along that line, saying that it was not pertinent to the issue. The witness was further asked if he and his wife did not on that occasion tell the daughter to leave home, and an objection to the question was sustained. Afterwards the witness said he did not tell her to leave home, and did not remember whether the incident was before or after she began staying with Bridgeman, but thought it was after she had begun to stay at night at the Bridgeman apartments. Defendants also attempted to show by Eula Miller that her father and mother attempted to compel her to sleep with the hired girl, who was dirty, filthy and lousy, and that her father beat her over the head with a box and told her to leave, and that she was compelled to give up her room and occupy that of the hired girl, and upon refusal to sleep with the hired girl her mother told her to leave, and drove her away, and because of this alleged ill treatment at home, she went to sleep at the Bridgeman rooms, having no other place to go. The court refused to allow this evidence, and evidence of this character to go to the jury. Defendants assert that this evidence was proper to show that Eula Miller had no intent to lewdly and lasciviously cohabit with Bridgeman when she left her home to go to his apartments. Whether her intent was innocent at that time is not

very pertinent. If, after going to his apartments with the purest intentions, she discarded those intentions and began a life of reproach, she would not be held guiltless. She had four married sisters living in Clarksburg, with whom she seemed to be on friendly terms. Even if life at her father's house was unendurable, the necessity for living with Dr. Bridgeman is not perceived, and her actions there are not condoned because she was driven from home. She stated to her sisters that she was married to Dr. Bridgeman. This was the reason which she gave to them why she was living with him in that manner, and not that her parents had driven her from home. We cannot see how this evidence would have changed the verdict. Should her intent have been innocent in the beginning, she remained there for over a year, creating the false impression by word and deed that she was in lawful wedlock. It is not perceived how this evidence, if admitted, would help Dr. Bridgeman. Did he take her into his apartments because she was homeless and live with her for that reason? Did he take advantage of her because she was turned out of home? If he wished to take care of her was it necessary for him to live and cohabit with her? The evidence, if admitted, would have accentuated his guilt, and could not have helped her. The cause of her going to his rooms is not important. It is what they did during the long time she remained there, which constitutes the violation of law of which they are convicted.

The remaining ground of error alleged is that the evidence is not sufficient to justify the verdict, and that the court should have set aside the verdict and granted a new trial for that reason. We are cited to the cases of *State* v. *Foster*, 21 W. Va. 767; *State* v. *Miller*, 42 W. Va. 215; *State* v. *White*, 66 W. Va. 45; and *State* v. *Ramage*, 75 W. Va. 524.

The crime of lewd and lascivious cohabitation under section 7, ch. 149 of the Code, means the living and cohabiting together of a man and woman, not married to each other, in the same house or apartments, as husband and wife. As stated in the Miller case, occasional acts of secret illicit intercourse are not alone sufficient. It must be proved to the

satisfaction of the court and jury that the parties cohabited together, that is lived together as man and wife. It is not necessary that they should hold themselves out to the world as man and wife, as is held in the first point of the syllabus in the Ramage case. The burden of the offense is the open, lewd and lascivious conduct of the parties, not being married, and living together as if the conjugal relation existed, and in this way undermining and debasing public morals. The facts proven here are quite different from those found in the cases above cited. In the Foster case the woman lived in a house used as a kitchen, near the residence of the defendant, and she did the cooking and superintended the household affairs, and all ate at the same table. This woman was hired as a cook and slept in the kitchen near Foster's residence, and there was no evidence whatever that they cohabited together; no evidence of any acts of illicit intercourse. In the Miller case it appeared that Miller was clearing a piece of land he owned, and employed several workmen for that purpose, and also employed Susan Hatton and other women to do the house work and cook for the laborers. The house consisted of one room, where she slept, and Miller and various other work hands also slept in the same room. It did not appear that Miller had ever had illicit intercourse with Susan Hatton, and never even passed a day with her in the house, which was the common dwelling place of all. She was employed in February and gave birth to an illegitimate child in the following September. There was nothing in this case to show that the defendant cohabited with her in any way. These facts were clearly insufficient to sustain the verdict. In the White case the defendant had leased a house to Geneva Dunnigan, a single woman and the mother of an illegitimate child then three years old, for the purpose of keeping boarders, and he and others boarded with her in that house, which had four rooms, consisting of a dining room and kitchen, and two bed rooms in each of which were two beds. White and other boarders occupied one of these rooms, and Geneva Dunnigan and her child and a hired girl occupied the other. There was no evidence of illicit intercourse

between White and the Dunnigan woman or that any improper relations ever existed between them. They did not hold themselves out to the world as man and wife, although a short time after the house was finished they occupied it together, after which time others came there to live and board. White, as well as the other boarders, assisted in doing chores about the house. The evidence was held to be insufficient to establish the crime of lewd and lascivious cohabitation. In the Ramage case it appeared that the defendant was the general superintendent of a coal company and lived in the same house with Maud Hunter, an unmarried woman, who had been employed by the coal company at a fixed sum per month to do the cooking and washing and general house work; and that for a year or more previous to the indictment she and Ramage had lived in the house alone; that the house contained a number of rooms, and he occupied a bed room on the lower floor and she one up stairs; that on three or four occasions they were seen together in daylight going in the direction of the church and to ball games and that cows and other domestic animals were kept on the premises, which she fed and attended, while he followed his occupation as superintendent of the mines. The only evidence of illicit intercourse was given by one witness, a Mrs. Pilcher, who was visiting at the Ramage house. This witness saw Maud Hunter leave her room on the second floor about three o'clock one morning and go down the stairs and enter Ramage's room. This evidence of illicit intercourse was flatly contradicted by both of the defendants, but the jury evidently believed Mrs. Pilcher and found the defendants guilty; but the court held that the evidence was not sufficient to sustain the indictment for lewd and lascivious cohabitation.

In the case under consideration the defendants were together occupying the two rooms, and it is very evident that they occupied them together almost continuously after she left her father's home and began sleeping at the Bridgeman apartments. The evidence of the various witnesses who visited the apartments is summed up in that of Mrs. Cozard when she said, "They lived there seemingly the same as the rest

of my sisters and their hubands.'' Eula Miller, quite con-sistently asserted that she was married to Bridgeman, evidently realizing that their conduct was inexcusable except as that of husband and wife. It is true that there was no evidence that Dr. Bridgeman claimed that they were married, but on one occasion he was introduced as the husband of Miss Miller and made no objection thereto. He tacitly consented to the fiction. It is also true that this is denied by both of the defendants, but that was a question for the jury to determine, and evidently the jury believed the testimony of the State's witnesses in that regard. If the evidence is not sufficient to sustain the indictment for the offense charged, it would be difficult indeed to ever obtain a conviction for this crime.

Instructions were given to the jury. They do not appear in the record, and evidently properly propounded the law applicable to the facts, as no exceptions were taken thereto.

It is peculiarly within the province of the jury to pass upon the credibility of the witnesses, and, although the evidence of the State's witnesses is wholly contradicted by the two defendants, we cannot invade the province of the jury, and have concluded that the evidence is sufficient to sustain the verdict.

*Affirmed.*