# CHARLESTON.

STATE *v.* BEEMAN R. WRIGHT

(No. 6464)

Submitted March 11, 1930.    Decided March 25, 1930.

*R. F. Kidd, J. D. Jones* and *Wm. T. George,* for appellant.
*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,.* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

Convicted of murder in the second degree and sentenced to six years in the penitentiary, defendant prosecutes error.

Defendant Wright and the deceased, Weaver, lived in the same neighborhood, the distance between their residences being about one mile, and on the same county road. About nine years previous to the fatal affray, they had quarreled over the price of a bull which one proposed to buy from the other. From this early beginning of ill-feeling between them, they·

became embittered by subsequent causes and clashes until they became hostile and threatening, each toward the other. The record is replete with threats by both. The neighborhood was aware of the mutual animosity, and efforts were made by third persons to effect a reconciliation which failed of fruition, the evidence tending to show that Weaver always refused to be reconciled. Threats on the part of Weaver induced the prosecuting attorney to lend his pistol to defendant for self-defense, the latter having applied for and received a permit to carry the weapon under the statute. The evidence shows that defendant would often make long detours to avoid Weaver; that when they met, Weaver would be the more aggressive; and the evidence tends to show that defendant became afraid of his life at the hands of Weaver, and hence obtained the permit to carry the pistol. These threats, or at least some of them, appear to have been communicated respectively to the actors. Those made by Wright, with the exception of two, appear to have been conditioned upon the continued aggressive methods of Weaver, the substance being that if Weaver continued to pursue him, the latter would shoot or kill the former. On the forenoon of June 22, 1928, Wright had started on horseback to an adjoining county to attend to some business, and had stopped in front of the residence of Mrs. Julia Simmers to request her son, Brooks, to drive Wright's car to Grantsville that evening. While he was engaged in conversation with them, Weaver walked by on the road without speaking to anyone. Wright continued his conversation probably five minutes and then pursued his journey, remarking, according to Mrs. Simmers, that he wanted "to pass that gentleman up the road". Wright says that he waited long enough for Weaver to leave the road by a path which pedestrians usually pursued to avoid the windings of the road up the Radabaugh hill (a shorter route for pedestrians), so that he could avoid Weaver and pass on his journey while Weaver was on the path. A short time after Wright went up the road, three shots were heard by Mrs. Simmers and her son from that direction, and shortly thereafter, Wright rode back and hollowed for Brooks Simmers to come up there. The latter, knowing of the ill-feeling,

refused to go, saying his mother's nervous condition was such that he could not leave her. Shortly after the shooting James Whipkey, riding down the Radabaugh hill, came upon the scene of the tragedy, and found Weaver lying by the roadside either dead or unconscious, and Wright standing near, holding his riding mare, and with his foot turning over or kicking together two stones, which he said had been in Weaver's hands. He remarked to Whipkey (according to Whipkey's evidence), that he had "finished the job", and that Weaver had thrown one stone and hit him when the shooting took place. Wright's version is that when ascending the grade he came up behind Weaver who had apparently delayed his progress, and that the latter set his basket down on the bank of the road (where it was found) and began an assault with rocks, declaring that it was his intention to end their quarrels, and threw one rock which struck a glancing blow on the side of Wright's body, whereupon he (Wright) shot in the air to scare the deceased; and then as his assailant was about to throw another stone, shot twice bringing him down at the second shot. The autopsy showed two gunshot wounds, one entering the right inner border of the right armpit ranging downward and entering the right auricle of the heart, a fatal wound; and the other entering the left breast and ranging downward, but the doctor could not say whether it entered the cavity of the body. The road at the place of the tragedy was about fourteen feet wide with the hill on one side, up which it ran, and the embankment and creek on the other.

The indictment was returned on October 11, 1928, and on the following day, the trial was set for October 18, 1928, seven days later. Defendant, who was under bond to answer an indictment, was placed in jail on the 11th or 12th, and remained there until his trial which began on the 18th.

A motion for continuance was made, based on the absence of defendant's wife and witness Loudin, both of whom were claimed to be material and important witnesses, and the substance of the testimony they would give, shown. Process had not been served on Loudin, although issued. The officer reported that he, Loudin, was said to be in Parkersburg. Pro-

·cess was issued for him to the sheriff of Wood County, and not served. The motion was overruled, and this is the first assignment of error.

The trial judge was of opinion that defendant's wife was a material witness, but inasmuch as her evidence at the preliminary hearing had been preserved by a stenographer and transcribed, he would permit that evidence to be read to the jury, and the motion was overruled. It appears that Mrs. Wright had been suffering with cancer of the stomach, and had been to Baltimore for radium treatment. Later, she had been to Dr. R. B. Miller of Parkersburg, who had treated her, and sent her home with instructions to return in three weeks if she got no better. She advised him at the end of that time that her condition was no better, and he wrote her to come to him. She promptly left for Parkersburg on Saturday, October 13, 1928, and expected to return the same day; but Dr. Miller would not permit her to return on account of her condition, saying if she left for home he would not treat her; and his affidavit to the judge dated October 13, 1928, says that she was quite ill following the use of radium and would be confined to her bed for several days; later, on the 16th of October, he made another affidavit that she was quite ill and could not leave the hospital for fifteen or twenty days, and if she did so her life would be in danger. It is argued that her trips to Parkersburg was for the purpose of a continuance. That argument is without merit. When she left home on the 12th, she was obeying her physician, and expected to return at once. She became so ill that she could not do so, and it was stated in argument that the malady was fatal; her evidence having been preserved later, in view of her alarming condition.

Was her evidence material? The court so considered, but thought her evidence at the preliminary hearing would serve as well as her appearance to give verbal testimony. The bill of rights says that a person on trial shall be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his own favor. If her evidence was important and material, defendant was entitled to have her before the jury where, by her conduct and demeanor, the jurors could determine the truth and weight of her evidence.

If she could not be present at a future date, then her deposition could have been taken as the next best step. It is true that trials of felonies and misdemeanors shall be without *unreasonable* delay (Art. 3, Sec. 14, Const.), and that felonies shall be tried at the term at which the indictment is found unless good cause be shown for a continuance. Sec. 1, chap. 159, Code. Continuances may be, by motion of the state or the defense, each based on "good cause" therefor. It will be observed that the indictment was found, on the 11th. On the following day, the trial was set for the 18th, when the trial was had. It was rather a short time in which preparation for defense could be made, taking into consideration the fact that defendant was incarcerated in jail. The mandate of the Constitution for trials in criminal cases without *unreasonable* delay should be followed, but always controlled by considerations for a fair and impartial trial of the accused. *State* v. *Jones*, 84 W. Va. 85. The good faith of the motion to continue is apparent. It was not trivial and for the purpose of delay. After-developments in the trial show that she was a material witness, for alleged threats by Wright against Weaver without qualification were testified to by boarders in the home. They were the most damaging threats shown, for they evinced an intention on the part of Wright to kill the deceased irrespective of justification or defense. These threats were denied by Wright, and it is apparent that the evidence of the wife, who was said to have been present, was vitally important to corroborate defendant's denial. The other threats of defendant were qualified, and based upon Weaver's continued acts of violence, while these threats under discussion were without qualification. In view of these unqualified threats, negatived only by the man whose life was at stake, the jury may have concluded that defendant deliberately pursued Weaver on the morning of June 22nd for the purpose of killing him. The theory of the prosecution was that defendant was guilty of wilful and premeditated murder, and that theory was sought to be upheld by these unqualified damaging threats, coupled with defendant's alleged declaration, made when he left the Simmers residence, after Weaver had passed a short time before the fatal shooting, that he

wanted to pass the gentleman up the road. It is true that this alleged remark was equivocal, and defendant's purpose may have been to pass the deceased while the latter was on the foot path off the highway, as testified to; but these threats under consideration, would tend to induce the jury to believe that defendant designed to overtake the deceased to "finish the job". And on this evidence the prosecution predicated its instruction for a conviction for a wilful and premeditated murder. Can it be said that a refutation of these unqualified threats of intention to kill was not of vital importance to defendant? It is true that this particular evidence was not adverted to in the motion for continuance, and not made a ground of materiality for the evidence of the absent witness, for such evidence was not anticipated and the absent witness had no opportunity to deny them on the preliminary hearing. It is apparent then that the prisoner's rights were not conserved by an offer to allow her evidence, preserved at the preliminary hearing, to be read. It would have been of no probative value as to these unqualified threats, because it was silent as to them. Where a motion for continuance has been overruled, and the trial results in a judgment adverse to the movant, and from the whole case it seems reasonably apparent that he was entitled thereto, and the refusal to continue has prejudiced his rights to a fair trial, such adverse action is ordinarily deemed sufficient cause for reversal of the judgment thus obtained. *State* v. *Jones,* 84 W. Va. 85; *Buster* v. *Holland,* 27 W. Va. 510; *Cook* v. *Cook,* 63 W. Va. 413; *Doane* v. *Pulp & Lumber Co.,* 77 W. Va. 454. We are of the opinion that under the circumstances and facts detailed, defendant should have been granted a continuance; that his right of full defense has been prejudiced; and that he is entitled to another trial.

Another point of error is that the evidence does not warrant a conviction of murder in the second degree. Upon another trial the evidence may be materially different, and it would be manifestly improper to discuss the proposition that malice on the part of defendant has or has not been shown. The sufficiency of the plea of self-defense and the existence of

malice in such cases are generally jury questions and are ordinarily controlled by the verdict.

Criticism is also made of state's instruction No. 10 relating to the jury's right to weigh the evidence of a witness because of his interest in the controversy, and his demeanor on the witness stand, and their right to disbelieve his evidence if they believe he has testified falsely to any material matter. The criticism is that it singles out the defendant and casts doubt upon his evidence inasmuch as he was the only person with interest in the controversy. We do not so read the instruction. It does not single out defendant as was done in *State* v. *Green*, 101 W. Va. 704, and *State* v. *Vest*, 98 W. Va. 138, but applies to every witness.

The judgment will be reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*