STATE OF WEST VIRGINIA

*v.*

ARLIE C. SIMMONS

(No. 9877)

Submitted January 28, 1947. Decided March 25, 1947.

34

*William T. George, Sr.,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, *Ralph M. Hiner* and *Eston B. Stephenson,* Assistant Attorneys General, and *Don Cunningham,* Prosecuting Attorney, for defendant in error.

LOVINS, JUDGE:

The defendant, Arlie C. Simmons, was granted a writ of error and supersedeas to the judgment of the Circuit Court of Pendleton County, sentencing him to serve an indeterminate term of two to ten years in the penitentiary, and to pay the costs of this prosecution.

At the March term of the Circuit Court of Pendleton County defendant was indicted by the grand jury of that county on two counts. The first count charges that defendant unlawfully, feloniously and maliciously attempted to shoot and wound Allen Armstrong, with intent to maim, disfigure, disable and kill him, and in attempting to commit said felony, he shot and wounded Nina Taylor. The second count is similar, except that defendant is charged with attempting to shoot, stab, cut and wound the said Armstrong with intent to maim, disfigure, disable and kill him, and that in attempting to do so defendant, unlawfully and feloniously shot, stabbed, cut and wounded Nina Taylor.

Nina Taylor was shot and seriously wounded about ten o'clock on the night of October 6, 1945, while standing at or near a gate in front of her home. The shooting occurred along the east side of the public highway, designated as Route No. 28, which runs in a general north-south direction through the Town of Circleville in Pendleton County.

Defendant is the owner and operator of a cafe or restaurant situate at the southeast corner of the intersection of Route No. 28 with a highway referred to as the "Old Franklin Road". The first floor of the building is occupied by the restaurant, and the second floor is occupied by defendant and his family as a residence. Immediately south of and parallel to the restaurant building there is an alley approximately sixty feet in length, which extends from Route No. 28 in an easterly direction to the rear of defendant's building. South of the alley is a building used as a filling station and known as the "old liquor store," said building being located more distant from Route No. 28 than the restaurant building. The space immediately in front of the gasoline station is occupied by a concrete porch and some gasoline pumps, the exact location of the said pumps not being shown by the record other than that they were on a line with the front of the restaurant building. About fifty feet to the south of

the restaurant building is a residence occupied by Nina Taylor. The entrance to the Taylor home from Route No. 28 is through a gate.

Between nine and nine-thirty on the night of October 6, 1945, Allen Armstrong, a brother-in-law of defendant, went to defendant's residence on the second floor of the restaurant building, accompanied by Nina Taylor's daughter. While there he and defendant engaged in a quarrel as the result of which defendant ordered Armstrong to leave his premises. Complying with defendant's order, Armstrong and his companion left the residence of defendant by a stairway at the rear of the restaurant which entered the eastern end of the alley above mentioned. They went by way of the alley to the highway and turned south toward the Taylor home. Defendant followed them as far as the western end of the alley near Route No. 28, where defendant stopped and continued the quarrel. When Armstrong reached a point on the east side of Route No. 28 opposite the gate leading to the Taylor home, John Armstrong, a brother of Allen, joined in the quarrel. Thereafter for a period variously estimated from ten to fifteen minutes, defendant and the Armstrongs engaged in a cursing bout. All the evidence introduced by the State and the defendant coincides up to this point. Thereafter there is a sharp conflict between the evidence introduced by the State and defendant. According to four witnesses testifying for the State, defendant left the scene of the quarrel and went back into the alley in the direction of the entrance to his apartment, and a short time later appeared in the western end of the alley near the front of the filling station with a gun and renewed the quarrel, threatening to kill the whole Armstrong family. State's witnesses also testified that defendant went into the shadows in the alley, raised the gun, apparently aimed at the two Armstrongs, who were then standing just outside the gate to the Taylor home, and fired the gun; that a flash came from the gun and the report thereof heard. Nina Taylor, then standing with her daughter near the inside of the gate, was struck in

and about the abdomen and thighs by shots discharged from a shot gun. It is further shown by said witnesses that an automobile owned by Paul Simmons was parked immediately in front of the Taylor home on Route No. 28, and that an automobile owned by John Armstrong was double parked alongside the Simmons automobile. It is proper to note that at least two shots struck the Simmons car, one in the right headlight and the other in the radiator just to the right of the center thereof.

There is evidence that the headlights of John Armstrong's automobile were burning, illuminating the side and front of the restaurant building, and that visibility at that time and place was otherwise good. Contrary to this, defendant's witnesses testified that no automobile lights were burning at the time of the shooting; that the night was dark; and that it was impossible to see and recognize anyone in the vicinity of the gasoline filling station.

Defendant's version of the actual shooting, which is corroborated by several witnesses, is that as he followed Allen Armstrong through the alley and toward Route No. 28, he picked up a piece of firewood, which he carried to the intersection of the alley and Route No. 28; that he stopped there and continued the quarrel with the Armstrongs, who had gone down the street to the vicinity of the gate in front of the Taylor home. Defendant states that his quarrel with the Armstrongs was continuous until the shot was fired, and that when it was fired it came from a point about sixty feet to the rear of him and from the vicinity of the intersection of Route No. 28 with the "Old Franklin Road."

Defendant further testified that he was struck in the hand and knee by shot at the time the gun discharged, and that immediately after the shot was fired, he returned to the bed in his room where he remained until the following morning. Defendant's wife and his servant testified that blood was found on the linen of the bed in which he slept. It further appears that defendant owned only

one shot gun, which had been lent a week earlier to Eddie Grogg, and that the gun was not returned to him until a week after the shooting. The evidence with reference to the loan of the gun is uncontradicted.

At this point it is well to say that we do not regard the efforts made by the State and the defendant to impeach the credibility of some of the opposing witnesses as being material.

On April 11, 1946, and before the trial, defendant filed an affidavit setting forth that on March 28, 1946, defendant had procured subpoenas for John and Allen Armstrong to appear and testify as witnesses in his behalf on April 8, 1946; that the subpoenas were not served; that defendant did not know the whereabouts of John Armstrong, but, upon information from the sheriff to whom process was given, stated that the parents of John Armstrong were unable to give him the address of the said Armstrong at that time. Defendant stated in his affidavit on his information and belief that Allen Armstrong was absent in the armed forces of the United States, and that he was "reliably informed that the said Allen Armstrong will be discharged from the Armed Services on points within a very short time, probably within the next thirty days and that he can be obtained as a witness to testify in this case at the next term of Court, * * *." Defendant further stated in his affidavit that the witness Allen Armstrong was material and necessary to his defense in that the witness would testify that defendant made him, Allen Armstrong, "leave the property and followed him down two flights of steps and out through an alley to the street * * *; that the altercation between said Armstrong and defendant kept up until the shot which wounded the said Taylors was fired; that defendant did not have a gun when he followed said Armstrong down the stairs, through the alley to the street, and that defendant did not go back into his store or his apartment to get a gun * * *; that it was too dark to see the defendant when the shot was fired, defendant being ap-

proximately forty-five or forty-six feet away from said Armstrong, * * *." The affidavit also stated that defendant expected to prove substantially the same facts by the witness John Armstrong. The Prosecuting Attorney of Pendleton County filed a counter-affidavit in which it was set forth that both witnesses were present at the March term of court, and had visited the home of defendant; that defendant had made no attempt to have proper process issued for them at that time. The prosecuting attorney's affidavit incorporated, by reference, a transcript of the testimony of John Armstrong before the Grand Jury of Pendleton County, which indicated that the said Armstrong would substantially corroborate the four witnesses who testified for the State. In reply to the counter-affidavit filed by the prosecuting attorney, the defendant filed another affidavit, in which he admitted that the two Armstrongs had visited his home at the beginning of the March term of court, but that said term of court had been continued until April and the docket therefor was not made up until after the Armstrongs had departed. The subpoenas referred to in the initial affidavit were issued on the same day that the docket for the March term of court was set. The reply affidavit thereafter restated what defendant expected to show by the two absent witnesses. On the basis of the affidavits the court overruled defendant's motion for a continuance.

Defendant tendered his instruction No. 6, which reads as follows: "The court instructs the jury that they cannot convict the accused of *an attempt to commit a felony* unless they are satisfied beyond a reasonable doubt that the accused attempted to shoot Allen Armstrong as charged in the indictment and not some other person." This instruction, as offered, was refused, but the court modified it by striking out the underscored words and inserting in lieu thereof the words "the crime charged in the indictment." Defendant also tendered his instruction No. 7, which reads as follows: "The Court instructs the jury that, if justified by the evidence, they may find one of the following verdicts, felonious shooting, unlawful

shooting, assault and battery or not guilty." Although not appearing in the record, an order of the trial court states that in lieu of defendant's instruction No. 7 the court instructed that it should find: "We, the jury, find the defendant, Arlie C. Simmons, guilty as charged in the indictment"; or "We, the jury, find the defendant, Arlie C. Simmons, not guilty." After viewing the scene of the shooting the jury found defendant "guilty as charged in the indictment."

Defendant's assignments of error are: (1) that his motion for a continuance should have been sustained; (2) that instruction No. 6 offered by him should have been given without modification; (3) that instruction No. 7 offered by him should have been given; (4) that the instruction prepared and given by the Court in lieu of instruction No. 7 should not have been given; and (5) that the verdict should have been set aside and defendant granted a new trial.

In ruling on a motion for a continuance the trial court is governed by a sound discretion. *Hutchinson* v. *Park Corp.*, 128 W. Va. 419, 36 S. E. 2d 889, 891; *State* v. *Hamrick,* 112 W. Va. 157, 163 S. E. 868; *State* v. *McCoy,* 107 W. Va. 163, 148 S. E. 127; *State* v. *McDonie,* 96 W. Va. 219, 123 S. E. 405. Such discretion is reviewable, but the refusal of a continuance is not ground for reversal, unless it is clear that the trial court has abused its discretion and that the refusal of the continuance worked injury and prejudice to the rights of movant. *State* v. *Olivetti,* 107 W. Va. 357, 148 S. E. 205; *State* v. *Bailey,* 103 W. Va. 605, 138 S. E. 202; *State* v. *Jones,* 84 W. Va. 85, 99 S. E. 271.

A motion for continuance, based on the absence of a material witness, calls for a showing satisfactory to the trial court that due diligence has been exercised to procure the attendance of the witness; that his testimony is material; that the same facts cannot be proved by any other witness in attendance; that the movant cannot safely go to trial in the absence of such witness; and that

there is a probability of procuring the attendance of the witness, or his deposition, if the case is continued. *State v. Bridgeman,* 88 W. Va. 231, 106 S. E. 708; *State v. Jones, supra.* See *Hutchinson v. Park Corp., supra; Dimmey v. Railroad Co.,* 27 W. Va. 32. Generally such showing is made by an affidavit, and, if required by the opposing party, such affidavit must be filed showing, in addition to the foregoing, the name of the absent witness and the facts to which such witness is expected to testify with reasonable definiteness. Code, 56-6-7; *State v. Whitecotten,* 101 W. Va. 492, 133 S. E. 106; and *State v. Jones, supra.* The affiant, if required by the opposing party, must submit to cross-examination in open court as to the matters set forth in the affidavit. Code, 56-6-7; *State v. Jones, supra.*

*State v. Wright,* 108 W. Va. 715, 152 S. E. 743, is cited by defendant in support of his contention that the motion for continuance should have been sustained. In the *Wright* case the absent witness was confined in a hospital on account of serious illness, and was unavoidably absent. Her testimony was of such vital importance to defendant that he was deprived of a fair trial by reason thereof, and on writ of error this Court reversed the judgment of the trial court. But in the case at bar Allen Armstrong's absence was not unavoidable. All that defendant did to procure the attendance of Allen Armstrong was to issue a subpoena directed to the Sheriff of Pendleton County, although, according to statements contained in his own affidavit, he knew that Allen Armstrong was in the armed services of the United States. In so far as shown by this record defendant made no effort between the 28th of March, 1946, when he was apprised of the date of his trial, and the 11th day of April, 1946, the date of the trial, to locate or communicate with Allen Armstrong. If such effort had been made by defendant, it is possible that he would have been able to procure Allen Armstrong's attendance, and if he failed in such effort, his action therein would at least have indicated diligence to procure Allen Armstrong's attendance.

If the issuance and service of a subpoena for a witness would be useless, the failure to do so is not lack of diligence. *Hutchinson* v. *Park Corp., supra; State* v. *Stout,* 116 W. Va. 398, 180 S. E. 443. The converse of the proposition is true. The mere issuance of a subpoena for a witness is not in all circumstances such conduct as to establish diligence.

Defendant had the benefit of the testimony of other witnesses which tended to prove the same facts that he expected to prove by Allen Armstrong. Of course, Allen Armstrong, being the principal adversary of defendant in the quarrel may have afforded a more credible corroboration of the facts offered by defendant to exculpate him from the charges in the indictment. But defendant was not deprived of testimony similar to that which would have been given by Allen Armstrong. But it appears from the affidavits of defendant and the record testimony that Allen Armstrong's testimony would not have adduced any facts not otherwise testified to by other witnesses.

What has been said relative to the absence of Allen Armstrong applies in a measure to the absence of John Armstrong, but the controlling fact as to John Armstrong's absence is that he testified before the grand jury and if the transcript of his evidence before that body is correct and his testimony on this trial, if given, had been consistent therewith, defendant would have derived no benefit or advantage therefrom. A careful examination of this record and the application of correct and controlling principles of law lead to the conclusion that the trial court committed no abuse of its discretion in overruling the motion for a continuance.

It requires no citation of authority and no extended discussion to show clearly that defendant's second assignment of error is without merit. Instruction No. 6, offered by defendant was predicated on the false proposition that defendant was charged with an attempt to commit a felony. A perfunctory reading of the indictment shows that

he was charged with committing a felony while attempting to commit a different felony.

The third and fourth assignments of error will be discussed together. Defendant's instruction No. 7 would have authorized the jury to find one of four verdicts, but the instruction by the court in lieu thereof authorized the jury to find one of two verdicts. This question calls for discussion and consideration of the statute defining the crime charged in the indictment, reading as follows: "If any person in the commission of, or an attempt to commit a felony, unlawfully shoot, stab, cut or wound another person, he shall *be guilty of a felony, and, upon conviction, shall,* in the discretion of the court, either be confined in the penitentiary not less than two nor more than ten years, or be confined in jail not exceeding one year and be fined not exceeding one thousand dollars." Code, 61-2-10. The prototype of the foregoing statute was first enacted by the General Assembly of Virginia, in 1847, though doubtless its origin may be traced to other sources. Section 18, Chapter III, Title II, Chapter 120, Acts of the General Assembly of Virginia, 1847-1848. So far as we have been able to ascertain, the statute above quoted has not been before this Court. A discussion of the various changes this statute has undergone, both in Virginia and in this State, would be interesting, but is unnecessary to a decision of this case. Suffice it to say that the most significant change took place in the Code revision of 1931, when the italicized words were added. Upon analysis the foregoing statute requires, for conviction thereunder, proper and sufficient proof of two elements: first, an attempt to commit a felony, and, second, the unlawful shooting, stabbing, cutting or wounding of another person. The statute is plain and unambiguous in declaring that if these two facts are established, the person charged is guilty of a felony.

There is no basis for any finding of guilt as to the grades of crime defined by Code, 61-2-9, which is different from the crime here charged. In the case at bar defendant

was either guilty of a felony, or he was innocent. Nor is Code, 61-11-8, relative to the general classification of attempts applicable to this case. It follows that the refusal of defendant's instruction No. 7 and the giving of the instruction by the court in lieu thereof was not error.

The fifth assignment of error is postulated on the failure of the court to set aside the verdict and grant defendant a new trial. The reasons assigned by defendant for sustaining the motion to set aside the verdict covered the points of error hereinbefore discussed, and also the following: (a) that there is a fatal variance between the allegations and the proof; (b) that after-discovered evidence existed, as shown by defendant's affidavit hereinafter mentioned; and (c) that the counter-affidavit filed by the State controverting the affidavits of defendant relative to after-discovered evidence should not have been received and considered by the trial court.

Defendant contends that the variance between the allegations and the proof arises because the proof tended to show an assault on John Armstrong. We do not agree with that contention. The quarrel started with Allen Armstrong, and when Allen retired to the place where his brother, John Armstrong, was standing, the assault was still directed against Allen Armstrong. Furthermore, the alleged variance, if it existed, would not be material for the reason that it relates only to the attempt, a factual premise on which the charge of the actual felony is based. Moreover, the alleged variance could not in any manner have prejudiced defendant. See *State v. Johnson,* 111 W. Va. 653, 164 S. E. 31; *State v. Mullenax,* 124 W. Va. 243, 251, 20 S. E. 2d 901.

The defendant made a motion to set aside the verdict and offered in support thereof his affidavit relating to after-discovered evidence, which, in substance, stated that the gate at or near which Nina Taylor was standing when shot, had been relocated in the interval of time between that occurrence and the trial; and that if the gate had been at the old location at the time the jury viewed the

scene of the shooting, his version of the shooting would have been sustained and would have resulted in a verdict of not guilty. The State, by counter-affidavit, made by the prosecuting attorney, challenged defendant's affidavit principally on the ground that defendant, from the date of the alleged crime until the trial, had resided approximately forty-five feet from the gate so relocated, and that by the exercise of reasonable diligence he should have known of its relocation.

A verdict should not be set aside on the ground of after-discovered evidence unless it appears that such evidence is material; that it is not offered for the purpose of contradiction or impeachment of a witness; that it will produce a different result on a retrial of the case; that it is not cumulative; and that due diligence was used to discover it before the trial. *State v. Lemon,* 84 W. Va. 25, 99 S. E. 263. This Court has recently held that diligence must be exercised to discover evidence before the trial. *State* v. *McMillion,* 127 W. Va. 197, 32 S. E. 2d 625; *State* v. *Beckner,* 118 W. Va. 430, 190 S. E. 693. An affiant making such affidavit to be filed in a criminal case may be cross-examined by the prosecuting attorney with reference thereto. *State* v. *Lemon, supra.*

The affidavit filed here, when considered with the other facts and circumstances of this case, clearly discloses that defendant, who is also the affiant, lived in close proximity to the gate, and, if he saw the importance of the relocation of the gate, he could have, and should have, known the place from which it was removed, as well as its new location, and should have introduced testimony to that effect on his trial. This is enough to establish lack of diligence on his part. Furthermore, we fail to see wherein the after-discovered evidence was sufficient to give rise to even an inference that a jury hearing it would render a different verdict. It was not error to overrule the motion to set aside the verdict and grant defendant a new trial.

It is worthy of note that the State, acting through the

prosecuting attorney, chose to submit what are termed counter-affidavits to the affidavit in support of a continuance and the affidavit relative to after-discovered evidence, rather than exercise the right of cross-examination authorized by statute and the decided cases. The right of cross-examination accorded to the State would have served to test the truthfulness of the affidavits made by defendant in support of his two motions. In addition thereto, it is likely that the affidavits could have been controverted by counter-affidavit of witnesses available to the State other than the prosecuting attorney. We disapprove the practice of attorneys acting as witnesses in cases wherein they appear as counsel.

For the reasons stated the judgment of the Circuit Court of Pendleton County is affirmed.

*Affirmed.*

RILEY, JUDGE, dissenting:

It is with respect that I am constrained to dissent from the majority opinion solely on the ground that the trial court erred in refusing to grant the defendant a continuance.

In the appraisement of this question it seems pertinent to supplement the statement of facts contained in the majority opinion. In so doing attention is invited to the fact that defendant's theory of the case, as disclosed by his testimony, is that he was standing near the entrance of the alley leading from his apartment to Route No. 28, and facing in the direction of the place where the Armstrong boys were standing; that he was unarmed at the time he came downstairs; that, because the altercation between him and the Armstrong boys continued until the shot was fired, there was no time in which he could have returned to his premises for the purpose of obtaining a gun; and that while standing there a shot was fired to the rear of him from a location at or near the intersection of Route No. 28 and the old road to Franklin, causing some of the pellets to wound him in the left hand and left knee, and the remainder to pass him and wound

Nina Taylor and her daughter, Euva Taylor, and strike the car of Paul Simmons situated on Route No. 28 outside the Taylor gate, one pellet, according to the State's evidence, breaking the right headlight of the Simmons car which was facing north and another penetrating the radiator in the center thereof.

The witnesses, Emma Johnson and her husband, Jack Johnson, who were at the time the shot was fired seated in their automobile facing Route No. 28 in the direction of the old road to Franklin, and almost immediately opposite the Simmons store, testified that they saw a shadow or object moving around at the road intersection, and substantially behind the place where both the State's witnesses and defendant testify defendant was standing, and that immediately thereafter they heard a report and saw a flash at the place where they saw the shadow or object. Eddie Grogg testified that he was sitting in his car in front of Keith Judy's property directly across the road from the Simmons store; that he saw a person whose identity was indiscernible standing somewhere below where defendant was standing; and that he heard the gun "crack" and saw the flash of the shot. Odford Bartlette, aged sixteen, testified that at the time of the shot he was below the Warner store, which was south of the road intersection; and that he saw the flash of the shot at or near the intersection of the two roads. Thurmond Hoffman, who was standing with the Bartlette boy, looking toward the Taylor property, testified that it "seemed like I saw something" at the road intersection from which place he saw a gun flash. James E. Hoffman testified that as he drove into Circleville from Franklin and was getting out of his car at a place opposite the Simmons store, he heard an altercation and while listening to it saw a flash of a gun shot below the restaurant near the home of Charlie Warner, which flash indicated that the gun was pointed toward the Simmons service station and the Taylor property. Nola Hoffman, who was in the Simmons apartment at the time the altercation began, testified that she was standing on an inclosed front porch; that she

heard the controversy below; and that during the altercation she heard a shot from a point to the rear of the place where Simmons was standing at the time Mrs. Taylor was shot.

The majority opinion makes no reference to the testimony of these witnesses which, if believed, would fully sustain the defendant's theory of the case, and which remains in this record uncontradicted in every particular, except that Keith Judy, the occupant of the house opposite the Simmons store, testified that when he came out of the house in response to the sound of the shot he "don't remember seeing" any cars parked in front of his house, and a witness, Pet Warner, at whose place defendant's witness, James E. Hoffman, was living, testified for the State that Hoffman was at his house when the witness went to bed and was there when he got up; and that so far as he knew the witness Hoffman did not leave the house during the day or night of the shooting. The record, however, does not disclose whether Warner went to bed before or after Mrs. Taylor was shot.

Morever, this record discloses without contradiction that, at the time Nina Taylor was shot, only one shot, evidently from a shot gun, was fired, but nevertheless the defendant was shot in two places. Simmons testified that he was shot in the left hand and left knee. Defendant, his wife and Nola Hoffman testified that the next morning blood was found on the sheet and pillow slip of defendant's bed where his knee and hand had lain during the course of the night. Emma Taylor's testimony is to the effect that she helped to bathe defendant's leg about a week after the shooting and noticed that it was black and blue and had two small indentures on the knee. Thurmond Hoffman noticed on the day following Mrs. Taylor's injury defendant had a bandage on his hand, and a week later, when he accompanied defendant to Baltimore to have an X-ray taken, he noticed that defendant's leg was inflamed, and there were black and blue marks around the knee and it seemed that the skin had been punctured.

Defendant's wife says that when defendant came back from Baltimore, she noticed that his knee was very black and that she bathed it with rubbing alcohol and liniment. Nola Hoffman's testimony is to the effect that she could see "two shots" in defendant's knee, and that on the morning following she bandaged his knee. This evidence is uncontradicted and, if believed, sustains defendant's theory that he was shot while standing in the line of fire between the place where defendant's witnesses saw the object and the flash at the road intersection and the place where the Taylors were standing.

The foregoing evidence is not alluded to in this memorandum for the purpose of advancing the position that the evidence in this case was insufficient for the case to have been submitted to the jury; but because this evidence is so inherently strong, so coherent in every particular, and so thoroughly consonant with defendant's theory of defense, it bears particularly upon the materiality of Allen Armstrong as a witness. If Allen Armstrong had been available and had testified as defendant's affidavit stated he would, that defendant was unarmed at the time he forced Armstrong and Euva Taylor to leave his apartment and that he did not return to his apartment to obtain a gun, the verdict of the jury might have been in defendant's favor. The testimony of Allen Armstrong was not merely cumulative. Except for the fact that several of defendant's witnesses testified that the altercation between defendant and the Armstrong boys continued until the shot was fired, Allen Armstrong, if he had been called as a witness and testified, as stated in defendant's affidavit, would have been the only witness to corroborate positively the defendant in his testimony that he did not, during the course of the altercation, return to the house in order to obtain a gun. No witness for the defendant, not even Nola Hoffman, who went out on the porch on the second floor of the Simmons building in the dark, gave any testimony as to seeing Arlie Simmons during the altercation; and though Nola Hoffman testified that defendant did not come up-

stairs from the time he expelled Allen Armstrong and the Taylor girl from the premises until the shot was fired, her testimony did not exclude from the jury the possible inference that defendant may have obtained a gun downstairs in the rear of the building. So in this most important detail, the proffered testimony of Allen Armstrong would have been the only positive evidence corroborating defendant. Who would better be able to testify whether defendant was armed at the time of the shooting than the witness Allen Armstrong? He was in close proximity to defendant during the course of the former's expulsion from the apartment, remained in close proximity during the course of the altercation, and was named in the indictment as the person under attack at the time Nina Taylor was shot. A full examination of the cases in West Virginia and a rather exhaustive examination of authorities generally on the question of the continuance of a criminal case because of the absence of a material witness does not disclose a case identical to this. As stated in the majority opinion, "Of course, Allen Armstrong, being the principal adversary of defendant in the quarrel may have afforded a more credible corroboration of the facts offered by defendant to exculpate him from the charges in the indictment." In view of this statement I am at a loss to understand why Allen Armstrong was not a material witness.

Nor can it be said that the statements contained in defendant's affidavit as to Allen Armstrong's testimony are untrue or incredible. These statements stand uncontradicted on the instant record. Certainly, the prosecuting attorney made no effort to take the only course open to him under Code, 56-6-7, to impugn the affidavit by cross-examination of affiant. Under this provision of the statute, the prosecuting attorney's counter-affidavit has no proper place in this record, and should not have been considered by the trial court on the question whether defendant was diligent in procuring the presence of Allen Armstrong as a witness. However, from the unimpeached statements contained in defendant's affidavit

in rebuttal, it appears that, though Allen and John Armstrong were present in the Simmons home at the beginning of the March term of court, the case had not been set for trial until the Armstrongs had departed. The fact that the process was directed to the Sheriff of Pendleton instead of Pocahontas County, the latter being the residence of the Armstrong boys, is of no importance under our well-established rule that where circumstances render issuance and service of process useless, a failure to have same issued does not amount to lack of diligence. *State v. Stout,* 116 W. Va. 398, 180 S. E. 443. Defendant had only between March 28, 1946, when he was apprised of the date of his trial and April 11, 1946, the date of the trial, within which to obtain Allen Armstrong as a witness. In view of the fact that on March 28, 1946, Allen Armstrong was in the armed services, and, as disclosed by defendant's affidavit, was expected momentarily to be discharged therefrom within a period of thirty days, it seems to me that his discharge would occur before defendant would have had time either to take and have transcribed Allen Armstrong's deposition, or to effect his temporary release from the armed services, so that he would, after a long trip from his point of service, be able to attend the trial on April 11, 1946.

From the foregoing it seems to me that defendant did not have a reasonable time within which to obtain the presence of Allen Armstrong, and that he exercised all of the diligence which he was required to exercise in the circumstances of this case, and that his affidavit fully complies with all of the requirements prescribed in the majority opinion.

In *State v. Wright,* 108 W. Va. 715, 152 S. E. 743, this court held in point 1 of the syllabus: "Where a motion for continuance in a murder trial, because of the unavoidable absence of a material witness whose testimony is vitally important to the defense, is overruled, resulting in a judgment adverse to the movant, and from the whole case it is reasonably apparent that defendant was entitled to the continuance, and his right to a fair trial has

been denied by reason thereof, the appellate court will set aside the judgment and award a new trial." In all deference to the majority opinion, in commenting on the *Wright* case, it begged the question when it said that the testimony of the absent witness "was of such vital importance to defendant that he was deprived of a fair trial by reason thereof." Surely, the testimony of Allen Armstrong was of such vital importance to defendant on the question whether he was armed when Mrs. Taylor was shot, that his absence deprived defendant of a fair trial.

In *State v. Jones,* 84 W. Va. 85, 99 S. E. 271, 273, this Court, speaking through Judge Lynch, then an eminent member thereof, said: "Embedded in the common-law of the land is the principle of a fair and impartial trial alike in civil and criminal cases. To the extent reasonably avoidable no innocent person should be permitted to suffer the stigma and punishment incident to an offense of the commission of which he is not guilty, is an equally familiar and often reiterated legal principle. The duty to accord speedy trials is founded in sane reason and sound law, constitutional and statutory. But speed ought not be permitted to work injustice, and, lest it should do so, the provisions therefor, as we have seen, are qualified in the constitution [West Virginia Const. Article III, Section 14] by the significant phrase, 'without unreasonable delay,' and in the statute [Code, 62-3-1] by the like phrase, 'unless good cause be shown for a continuance'."

In my opinion the trial court abused its discretion in refusing a continuance. Neither this Court nor the trial court, unless gifted with powers beyond human ken, would know that the verdict would have been the same whether Allen Armstrong testified or not, and in the absence of such knowledge it was improper to refuse a continuance. This defendant has been convicted and will be deprived of his liberty, which is dear to every American citizen, by the failure of the trial court to grant him a complete and fair trial, which is consonant with our American system of justice.